**SMITH COUNTY EDUCATION ASSOCI-ATION, Plaintiff-Appellee,**

v.

**Joe K. ANDERSON, Superintendent of Schools for Smith County, et al., Defendants-Appellants.**

Supreme Court of Tennessee, at Nashville.

Aug. 20, 1984.

Charles Hampton White, William Prentice Cooper, Nashville, for plaintiff-appellee.

Jacky O. Bellar, Carthage, Henry Haile, Nashville, for defendants-appellants.

William B. Hubbard, Chief Deputy Atty. Gen., Michael W. Catalano, Asst. Atty. Gen., amicus curiae (for William M. Leech, Jr., Atty. Gen. and Reporter).

David H. Hornik, Kingsport, amicus curiae (for Tennessee Mun. Attys. Ass'n).

## OPINION

DROWOTA, Justice.

This action arose from unsuccessful collective bargaining negotiations between the Smith County Education Association and the Smith County Board of Education. After months of negotiations, the SCEA sued the Board, its individual members, and Joe K. Anderson, the Superintendent of Smith County Schools, alleging the Defendants

had committed acts made unlawful by the Education Professional Negotiations Act, T.C.A. § 49–5–609, and had violated the Tennessee Open Meetings Act, T.C.A. § 8–44–102(a). Following a jury trial, the Chancellor took the case from the jury and dismissed the complaint, deciding that both sides were negotiating in good faith, that the Defendants had not engaged in any unlawful acts, and that the Defendants had not violated the Open Meetings Act. The Court of Appeals held the Chancellor acted properly in taking the case from the jury; however, the Court found the Board had not negotiated in good faith and had violated the Open Meetings Act.

In 1978, the Education Professional Negotiations Act was passed which provides that when a professional employee organization had been selected, the board of education shall bargain with that organization as the exclusive representative of all professional employees employed by that board of education. T.C.A. §§ 49–5–605(d), 49–5–606. The parties are required to negotiate in good faith the following conditions of employment: salaries or wages, grievance procedures, insurance, fringe benefits, working conditions, leave, student discipline procedures and payroll deductions. T.C.A. § 49–5–611. Section 49–5–609 proscribes certain unlawful acts for either the Board of Education or the employee organization. The Board cannot, among other things, use or threaten reprisals against a professional employee or discriminate against such employee for exercising the rights granted by the act; interfere with, restrain or coerce employees in the exercise of rights granted under the act; or refuse to bargain in good faith. The employee organization cannot, among other things; refuse to negotiate in good faith; interfere with, coerce, or restrain professional employees or the board in the exercise of their rights granted by the act; or strike.

Following the selection of the SCEA as the representative of the Smith County Teachers, and the designation of Dr. Joseph C. Fields by the Board as its chief negotiator, the parties met on May 11, 1982, to negotiate for the first time. Dr. Fields informed the SCEA negotiators that insurance must be discussed before June 30, at which time the county commission would approve the new budget.

Since the 1976–1977 school year, the county had paid the total insurance premium for each teacher. In May, 1982, the monthly premium increased from $46.31 to $67.15 per teacher. The premium was paid by the Board during May and June despite the increase. After the first negotiation meeting, the SCEA negotiators attempted to discuss the insurance issue, but Dr. Fields refused to do so until other matters had been agreed upon. On June 28, the Board sent notice to all teachers that payment of insurance premiums would end on June 30.

This cause of action was filed on August 27, 1982, in an attempt to have the payment of the insurance premiums continued until negotiations could be concluded. A temporary restraining order was entered directing the Board to maintain the insurance in effect. Within a few days of the entry of that order, Dr. Fields announced that the Board would no longer deduct SCEA dues from the teacher's pay as had been the practice for several years prior to the 1981–1982 school year. There are no minutes of the meeting of the Board where this action was authorized. The Superintendent of Schools, Joe Anderson, testified that he took the action pursuant to advice from Board members.

On two occasions, September 3, and September 16, 1982, after the complaint in this action had been filed, the Board met privately, without notice, with its attorney and Dr. Fields. The SCEA filed a supplemental complaint on September 17, 1982, alleging violations of the Open Meetings Act and further acts on the part of the Board amounting to a refusal to negotiate in good faith. On October 27, 1982, the defendants filed their answer and demanded a jury to try the factual issues in this action.

The trial began on November 18, 1982, before the Chancellor and a jury pursuant

to the defendants' demand. At the end of all the proof, ten special issues were submitted to the jury. The jury decided, among other things, that the Board had negotiated in good faith and that the SCEA had not negotiated in good faith.

The Chancellor entered a final decree on January 3, 1983, in which he concluded the jury verdict was merely advisory due to the inherently equitable nature of relief sought, and accordingly, the court should decide the issues. The Chancellor also made the following findings:

> The court does find as a fact that both sides did honestly and sincerely try on many occasions to reach agreements upon the various problems and proposals which confronted them. This court further finds and holds that the plaintiffs did not establish by a greater weight of the evidence bad faith upon the part of the defendants, failure to negotiate in good faith upon the part of the defendants, or any other deliberate effort upon the part of the defendants or either of them to damage or destroy the organization known in the record as SCEA ....
>
> This court finds as a fact that the defendants did not knowingly or wilfully engage in any unfair labor practice in connection with their effort to reach agreement with the plaintiffs.
>
> This court finds as a fact that the proof fails to establish in any instance that the Board of Education violated the provisions of the Open Meetings Act.

Having so found, the Chancellor dismissed the complaint.

The issues raised on appeal are: (1) Does a public body engaged in litigation have the right to meet in private with its legal representatives? (2) Is a party to an action brought under the Education Professional Negotiations Act, T.C.A. § 49–5–601 to 5–604, or the Open Meetings Act, T.C.A. § 8–44–101 to 106, entitled to a jury trial and if so, what is the effect of the verdict? (3) Does the unilateral change of benefits during negotiations amount to an unlawful act under T.C.A. § 49–5–609?

As noted above, the Court of Appeals held the parties are entitled to a jury trial but the effect of the jury's verdict is advisory only. The court further held that a unilateral change of benefits during negotiations amounts to a refusal to bargain in good faith. For the reasons set forth below, we reverse the Court of Appeals with regard to the jury verdict issue and we affirm the Court's judgment of the effect of a unilateral change of benefits during negotiations. However, we will first address the question of whether the Board had the right to meet with its attorney in private for the purpose of discussing the lawsuit in which it was involved.

## I. *The Open Meeting Issue*

The Court of Appeals held that the School Board violated the Tennessee Open Meetings Act, T.C.A. § 8–44–101, et seq., when it met privately with its attorney and Dr. Joseph Field during the course of the present litigation.

Complaint is made of two particular meetings. The first occurred on September 3, 1982, when after a hearing in the case in Chancery Court, the Board, its attorney, and Dr. Fields met for twenty minutes behind closed doors in the second floor witness room at the courthouse. No notice of the meeting was given.

The second alleged violation occurred on the night of September 16, 1982, when the Board and Dr. Fields met with the Board's attorney at his office from 7:00 to 9:25 p.m. Rick Dringenburg, husband of the SCEA president, and Chris Baxter, a reporter for the local paper, watched Board members enter and leave the office and observed the meeting through the office window. Again, no notice was given of the meeting.

Section 8–44–101(a) of the Tennessee Open Meetings Act "declares it to be the policy of this state that the formation of public policy and decisions is the public business and shall not be conducted in secret." Section 8–44–102(a) then provides that "[a]ll meetings of any governing body are declared to be public meetings open to the public at all times, except as provided

by the Tennessee Constitution." There is no express exception to the Act permitting a public body to meet privately with its attorney and it is for this reason that the Court of Appeals determined that both of the Board's meetings with its attorneys violated the Act. .This is a minority position among the courts in other jurisdictions that have considered the issue.

The majority of courts have fashioned an exception to their states' open meeting laws to permit private attorney-client consultation on pending legal matters even where the statute itself makes no such express exception. *See Sacramento Newspaper Guild v. Sacramento County Board of Supervisors*, 263 Cal.App.2d 41, 69 Cal.Rptr. 480, 487–492 (1968); *Associated Students of the University of Colorado v. Regents of the University of Colorado*, 189 Colo. 482, 543 P.2d 59, 61 (1975); *Times Publishing Company v. Williams*, 222 So.2d 470, 475–476 (Fla.Dist.Ct.App. 1969); *Fiscal Court of Jefferson County v. Courier-Journal & Louisville Times Co.*, 554 S.W.2d 72, 73 (Ky.1977); *Minneapolis Star & Tribune Co. v. Housing & Redevelopment Authority*, 246 N.W.2d 448 (Minn. 1976) (republished at 310 Minn. 313, 251 N.W.2d 620); *Oklahoma Association of Municipal Attorneys v. State*, 577 P.2d 1310 (Okla.1978).

Although the Tennessee Open Meetings Act differs from those of other states where courts have created exceptions, the rationale employed by those courts is noteworthy. Two approaches, both based upon the same policy consideration, are given for permitting this exception: (1) the evidentiary privilege between lawyer and client and (2) the attorney's ethical duty not to betray the confidences of his client. Each of these is recognized by the law of Tennessee. The first is found in T.C.A. § 23–3–105 which provides as follows:

> No attorney, solicitor or counselor shall be permitted, in giving testimony against a client, or person who consulted him professionally, to disclose any communication made to him as such by such

person, during the pendency of the suit, before or afterwards, to his injury.

Some courts see no reason why both the Open Meetings Act and the attorney-client evidentiary privilege cannot co-exist. It is on this basis that they permit private meetings between public bodies and their attorneys for the purpose of discussing questions of pending litigation. The two are reconciled by holding there has been no implied repeal of the attorney client privilege statute by the open meeting law. *See e.g. Oklahoma Association of Municipal Attorneys v. State, supra* (but note that Oklahoma's open meeting statute and the privilege statute were passed in the same year); *Sacramento Newspaper Guild v. Sacramento County Board of Supervisors, supra,* 69 Cal.Rptr. at 490–491; *Associated Students of the University of Colorado v. Regents of the University of Colorado, supra,* 543 P.2d at 61.

The California case, *Sacramento Newspaper Guild v. Sacramento County Board of Supervisors, supra,* contains the most-cited rationale for these cases. The court first notes that there is a presumption against repeals by implication and that they occur only where the two acts are so repugnant that there is no possibility of concurrent operation or the later provision undeniably shows an intent to supersede the earlier. 69 Cal.Rptr. at 490; *See Reams v. Trostel Mechanical Industries, Inc.*, 522 S.W.2d 170, 173 (Tenn.1975). The Court then goes on to state that

> [e]vidence of such intent is by far too thin.... In requiring board members to deliberate and act in public, these do not inexorably embrace the board members in their roles as clients calling upon their attorney for legal advice. In declaring the public's right to be informed, they do not necessarily propel the public's legal adversary into the lawyer-client conference clad in the robes of good citizenship.

69 Cal.Rptr. at 491.

Notwithstanding these well reasoned opinions that follow this rationale, we believe the second approach, the attorney's ethical duty to preserve the confidences and se-

crets of his client, provides a better basis for establishing an exception to the Open Meetings Act.

■ The attorney-client evidentiary privilege only extends to communications from the client to the attorney. D. Paine, *Tennessee Law of Evidence*, § 96, p. 111–112 (1974), and confidentiality is destroyed when those communications take place in the presence of a third party. *Hazlett v. Bryant*, 192 Tenn. 251, 257, 241 S.W.2d 121, 123 (1951). The privilege is designed to protect the client and because it belongs to the client, may be waived by him. When the third party in whose presence such communications take place is an agent of the client, the confidentiality is not destroyed. McCormick § 91 (2d ed. 1972); D. Paine, *Tennessee Law of Evidence*, § 97, p. 112 (1974).

■ When the Board discussed the present lawsuit with its attorney on September 3 and 16, 1982, it did so in the presence of Dr. Fields. As chief negotiator for the Board, Dr. Fields was the Board's agent; therefore, the confidentiality of those communications was not waived by his presence. However, the evidentiary privilege afforded by T.C.A. § 23–3–105 was waived by the passage of the Open Meetings Act.

In *Times Publishing Company v. Williams*, 222 So.2d 470 (Fla.Dist.Ct.App. 1969), that court was confronted with the identical issue involving a similar Open Meetings Act.[1] In establishing an attorney-client exception to the Act, the court pointed out the following:

> The attorney-client relationship is a unique one under the law. Within this relationship both the attorney and the client enjoy rights and privileges independent of each other. The privilege the client enjoys is one of confidentiality. The privilege of confidentiality can be waived and the effect of Chapter 67–356 has been to waive the privilege on behalf

of the board. The clear import of the "All meetings" provision of this statute is that the public, acting through the legislature, has waived the privilege with regard to the enumerated public bodies. *Id.* at 475.

We are of the opinion that the Tennessee Open Meetings Act had the same effect on the attorney-client evidentiary privilege. An exception based upon the evidentiary privilege would be in contravention of the Legislature's intent and express purpose as stated in the Act.

We note, however, that the Legislature was mindful of constitutional exceptions that may exist, and provided that all meetings shall be public "except as provided by the Tennessee Constitution." T.C.A. § 8–44–102(a). Article II, Sections 1 and 2, of the Constitution provide:

> Sec. 1. *Division of powers.*—The powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial.
>
> Sec. 2. *Limitation of powers.*—No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted.

■ It is well settled that the licensing and regulation of attorneys practicing law in courts of Tennessee is squarely within the inherent authority of the judicial branch of government. *Belmont v. Board of Law Examiners*, 511 S.W.2d 461 (Tenn. 1974). Furthermore, the "Supreme Court has original and exclusive jurisdiction to promulgate its own Rules. Its rule making authority embraces the admission and supervision of members of the Bar of the State of Tennessee." *Petition of Tennessee Bar Ass'n.*, 539 S.W.2d 805, 807 (Tenn. 1976).

This Court, in the exercise of its constitutionally delegated authority, has promul-

---

1. F.S.A. § 286.011 provides in relevant part:
   (1) All meetings of any board or commission of any state agency or authority of any county, municipal corporation or any political sub-division, except as otherwise provided in the constitution, at which official acts are to be taken are declared to be public meetings open to the public at all times.

gated rules and regulations governing the practice of law, and adopted a code of professional responsibility which includes the following:

CANON 4

A LAWYER SHOULD PRESERVE THE CONFIDENCES AND SECRETS OF A CLIENT

Ethical Considerations

EC 4-1. Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him. A client must feel free to discuss whatever he wishes with his lawyer and a lawyer must be equally free to obtain information beyond that volunteered by his client. A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system. It is for the lawyer in the exercise of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant. The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his client not only facilitates the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance.

■ In deciding this same issue, the Supreme Court of Minnesota stated in the case of *Minneapolis Star & Tribune Co. v. H. & R.A., Etc., supra:*

> This long-accepted theory protecting the attorney-client relationship is as basic to our legal system as the right of the judiciary to regulate and oversee the administration of that legal system.

246 N.W.2d at 452.

The Legislature, then, is without authority to enact laws which impair the attorney's ability to fulfill his ethical duties as an officer of the Court. *See Times Publishing Company v. Williams, supra* at 475.

■ It is clear that application of the Open Meetings Act to discussions between public bodies and their attorneys regarding pending litigation violates Article II, Sections 1 and 2 of the Tennessee Constitution. However, the Act itself is not unconstitutional, *Dorrier v. Dark,* 537 S.W.2d 888 (Tenn.1976), and we conclude that the Legislature did not intend for the coverage of the Act to include this situation. As previously stated, the Act provides for exceptions provided by the Tennessee Constitution. This is a clear indication of the Legislature's awareness of its constitutional limitations when passing the Act. Furthermore, the purpose of the Act as set out in T.C.A. § 8-44-101(a) states that it is "the policy of this state that the formation of public policy and decisions is public business and shall not be conducted in secret."

Our holding in this case in no way compromises this stated purpose. The exception is limited to meetings in which discussion of present and pending litigation takes place. Clients may provide counsel with facts and information regarding the lawsuit and counsel may advise them about the legal ramifications of those facts and the information given to him. However, once any discussion, whatsoever, begins among the members of the public body regarding what action to take based upon advice from counsel, whether it be settlement or otherwise, such discussion shall be open to the public and failure to do so shall constitute a clear violation of the Open Meetings Act.

The SCEA argues that any exception to the Open Meetings Act should be carved out by the Legislature and not the Court. In support of this position, the SCEA cites *Dorrier v. Dark, supra,* wherein we said:

> If experience should prove that the public interest is adversely affected by open meetings involving pending or prospective litigation disciplinary hearings, promotion and demotion hearings, prospective land purchases, labor negotiations, etc., it is the Legislature, not the Judiciary, that must balance the benefits and detriments and make such changes as will serve the people and express their

will. In our role as guardians of the Constitution, we find the act free of defect of constitutional proportions.

537 S.W.2d at 896.

The issues presented by the facts in *Dorrier* did not include the question of whether public bodies may meet in closed session with their attorney in order to discuss pending litigation. The statements in that case made with reference to such discussions are consistent with the holding in this case. To the extent public bodies discuss those matters among themselves, such communications shall be open to the public. Any exceptions to be allowed for those meetings should come from the Legislature and not the Court.

■ We are aware of the potential misuse of this exception in order to circumvent the scope of the Open Meetings Act. A public body could meet with its attorney for the ostensible purpose of discussing pending litigation and instead conduct public business in violation of the Act. Although the Act imposes only limited sanctions on a public body for such violations,[2] any attorney who participates, or allows himself to be used in a manner that would facilitate such a violation, would be in direct violation of the Code of Professional Responsibility and subject to appropriate disciplinary measures.[3]

In summary, we hold that discussions between a public body and its attorney concerning pending litigation are not subject to the Open Meetings Act. We emphasize that this is a narrow exception and applies only to those situations in which the public body is a named party in the lawsuit. Any such meetings should be conducted in a manner consistent with the guidelines set forth in this opinion.

## II. *The Jury Trial Issue*

The Board asserts that the determination of the jury on the issues decided is conclusive. The SCEA contends that the jury verdict was merely advisory and could be ignored by the trial judge. The answer to this question requires some understanding of the historic distinctions between law and

2. The following provisions provide for sanctions and enforcement of those sanctions when the Act is violated:

8–44–105. *Action nullified—Exception.* —Any action taken at a meeting in violation of this part shall be void and of no effect, provided that this nullification of actions taken at such meetings shall not apply to any commitment, otherwise legal, affecting the public debt of the entity concerned.

8–44–106. *Enforcement—Jurisdiction.*—(a) The circuit courts, chancery courts, and other courts which have equity jurisdiction, shall have jurisdiction to issue injunctions, impose penalties, and otherwise enforce the purposes of this part upon application of any citizen of this state.

(b) In each suit brought under this part, the court shall file written findings of fact and conclusions of law and final judgments, which shall also be recorded in the minutes of the body involved.

(c) The court shall permanently enjoin any person adjudged by it in violation of this part from further violation of this part. Each separate occurrence of such meeting not held in accordance with this part shall constitute a separate violation.

(d) The final judgment or decree in each suit shall state that the court retains jurisdiction over the parties and subject matter for a period of one (1) year from date of entry and the court shall order the defendants to report in writing semiannually to the court of their compliance with this part. [Acts 1974.]

3. In *Times Publishing Company v. Williams, supra,* the court noted

that an attorney who represents a public body such as covered under this statute is an officer of the court and a public figure himself, and we will not assume that he will abuse the above exception and allow the discussions in a properly held secret meeting to include any matters not specifically included in this aspect of the attorney-client relationship.

*Id.* at 476.

While we adhere to the views expressed in this opinion, we add that in the unfortunate situation where an attorney might fail to fulfill his responsibilities in this regard, he would be in violation of at least two provisions of the Code of Professional Responsibility.

DR 7–102 Representing a Client Within the Bounds of the Law.

(A) In his representation of a client, a lawyer shall not:

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.

equity which is detailed in Judge Cantrell's opinion.

"Article 1, Section 6, of the Tennessee Constitution preserves the right to a jury trial 'as it existed at common law.' *Marler v. Wear*, 117 Tenn. 244, 245–46, 96 S.W. 447, 448 (1906). In the classic common law system of courts, matters inherently legal in nature were tried in the law courts by a jury while matters inherently equitable were tried by the Chancellor without a jury. Therefore, there is no constitutional right to a trial by jury in a matter inherently equitable. *Harbison v. Briggs Bros. Paint Mfg. Co.*, 209 Tenn. 534, 541, 354 S.W.2d 464, 468 (1962).

"There is, however, a statutory right in Tennessee set out in Section 21–1–103 of the Tennessee Code which provides:

Either party to a suit in chancery is entitled, upon application, to a jury to try and determine any material fact in dispute, save in cases involving complicated accounting, as to such accounting, and those elsewhere excepted by law or by provisions of this Code, and all the issues of fact in any proper cases shall be submitted to one (1) jury.

"This section has been interpreted to extend the right to a trial by jury to cases of a purely equitable nature. *Moore v. Mitchell*, 205 Tenn. 591, 595, 329 S.W.2d 821, 823 (1959). The exceptions to the right are few:

It is our conclusion, therefore, ... that only those cases are excepted from the above quoted Code sections which are expressly excepted by the provisions of the Code, and those statutory exceptions not found in the Code; and such as by their very nature must necessarily be deemed inappropriate and not a proper case to be submitted to a jury such as *Pass v. State*, 181 Tenn. 613, 184 S.W.2d 1 [1944] (a contempt proceeding for violation of an injunction), unless in such case express provision for a jury trial is made by statute; or cases of such a complicated and intricate nature involving mixed questions of law and fact not suitable for

solution by a jury such as laches or estoppel.

*Id.* at 597, 329 S.W.2d at 823–25.

"Therefore, we conclude that the defendants were within their rights to demand a jury to try disputed issues of material facts. But, the real question in this issue still remains: Was the jury's verdict advisory or conclusive?

"If the action were one of a legal nature in which *legal* or *common law* rights were being tried as opposed to one in which *equitable* rights are asserted, there would be no doubt that the jury verdict would be binding on the Chancellor (except as to his common law or statutory right to grant a new trial or suggest a remittitur or additur). *Hurt v. Earnhart*, 539 S.W.2d 133, 136, (Tenn.App.1976). The verdict would be a common law verdict, the right to which is preserved in Article I, Section 6 of our Constitution. Where, however, the cause is inherently equitable, the right [to a jury] is purely statutory and the effect to be given to the jury verdict must be drawn from the statute that gives the right or from the common law itself.

"Prior to 1846 in Tennessee, there was no right to a jury trial in cases of an equitable nature. *State ex rel. Webster v. Daugherty*, 530 S.W.2d 81, 88 (Tenn.App. 1975). Although a chancellor might direct an issue to be submitted to a law court for a trial before the jury, he could accept the verdict or reject it and decide it himself. In other words, the verdict was purely advisory. *Id.*

"In 1846, the legislature passed the forerunner of T.C.A. § 21–1–103, which was the exclusive right to a jury in a purely equitable case. *See Greene County Union Bank v. Miller*, 18 Tenn.App. 239, 244, 75 S.W.2d 49, 52 (1934). Along with this statute the legislature passed a fairly elaborate set of companion statutes that dealt with the jury trial issue as it applied to chancery court. One of these, T.C.A. § 21–1016 (1955 ed.) (repealed), provided that the is-

sues to be decided by the jury were not advisory only:

> The trial shall be conducted like other trials at law, the finding of the jury having the same force and effect and the court having the same power and control over the finding, as on such trials at law.

"However, after the adoption of the Tennessee Rules of Civil Procedure these statutes were repealed and for a time there was no right to a jury trial in a case involving only equitable issues. *See Ashe v. State ex rel. Shriver*, 518 S.W.2d 360, 361 (Tenn.1975). Then, in 1976 the legislature reenacted Tennessee Code Annotated, section 21–1011 (now § 21–1–103), 1976 Tenn.Pub.Acts, ch. 436, but without its surrounding complement of statutes that describe the effect to be given to the jury verdict."

Opinion, Court of Appeals.

The Court of Appeals concluded that because the Legislature failed to enact the statutes describing the effect of the jury verdict in chancery court, the verdict is advisory in cases involving equitable issues. The Court went on to find that the remedies created by the Open Meetings Act and the EPNA are equitable rather than legal; accordingly, the jury verdict provided in T.C.A. § 21–1–103 is advisory only. We disagree.

In passing Chapter 436 of the Public Acts of 1976, the Legislature clearly intended to restore the law as it existed prior to the enactment of our present Rules of Civil Procedure. Senator Oehmig, the sponsor of the Senate bill which became Chapter 436 of the Public Acts of 1976, made the following remarks when the bill was before the Senate on its third and final reading:

> In 1972 when we adopted Rules of Civil Procedure, there were certain code sections that were repealed and this was one of them and it was felt that the present rules do not cover this situation of jury trials in Chancery and *this just puts back the old law into effect.* (Emphasis added.)

Clearly, the Legislature intended to re-establish the previous law and give a broad right to trial by jury. We conclude that the Chancellor was in error in taking the verdict from the jury and deciding the issues himself. Therefore, we reverse the Court of Appeals' determination that the jury verdict was advisory only.

The Board argues that the resolution of the jury verdict issue may determine the outcome of this case, and places great emphasis on the jury's answer to one of the ten special issues submitted, which is as follows:

> 2. Has the Smith County Board of Education refused or failed to negotiate in a good faith effort to reach a collective bargaining agreement with the Smith County Education Association? Answer in writing "Yes" or "No." *No*

Based on this answer, and in light of our holding that the jury verdict is binding, it would appear that the question of whether the Board negotiated in good faith is closed to further consideration. However, the verdict rendered in this case is a special verdict. In addition to the above quoted question, the jury was presented with the following:

> 4. Did the Smith County Board of Education exhaust reasonable efforts to reach agreement with the Smith County Education Association on employees health insurance for the 1982–83 school year before it voted to discontinue payment of teachers' health insurance premiums? Answer in writing "Yes" or "No." *No*
>
> 6. Did the Board of Education intend to stop paying insurance benefits for school teachers of Smith County Schools while it negotiated an agreement with the Smith County Education Association? Answer "Yes" or "No". *Yes*
>
> 7. Did the Smith County Board of Education stop deducting professional dues for the Smith County Education Association from the paychecks of teachers of

the Smith County School system while it negotiated an agreement with the Smith County Education Association? Answer in writing "Yes" or "No". *Yes*

In accordance with our holding that unilateral actions made during the course of negotiations constitutes a refusal to negotiate in good faith, the reasons for which are set forth below, it can be seen that the answers to questions 4, 6 and 7 are clearly inconsistent with the answer to question 2.

We note that questions 4, 6 and 7 are questions of fact and responses given by the jury are supported by the record. On the other hand, question 2 is a question of law which required the jury to reach a legal conclusion in order to respond. Rule 49, Tennessee Rules of Civil Procedure provides for special verdicts and governs their use.[4] However, the Rule does not specifically address the question before us; that is, the effect of a special verdict containing conclusions of law which are inconsistent with findings of fact.

In *Ratigan v. New York Central Railroad Co.*, 291 F.2d 548 (2d Cir.1961), the Second Circuit Court of Appeals was confronted with a similar problem involving a special verdict under Federal Rule of Civil Procedure 49(a), which is identical to TRCP 49.01. The jury was presented with eight interrogatories which included questions of fact and questions of law. The Court held that

it was a mistake to submit the legal questions pertaining to active and passive negligence to the jury because these were difficult legal principles and they gave the jury an unnecessary legal work-

out which was far beyond their comprehension... [T]he facts having been determined by the answers to questions 3, 4, 5 and 6, the erroneous legal conclusion stated in the answer to question 7 could be disregarded as surplusage.

*Id.* at 555.

Turning to the present case, we think it was improper and unnecessary to submit questions which required the jury to determine whether or not the Board negotiated in good faith. We point out that the right afforded by T.C.A. § 21–1–103 is "to a jury to try and determine any *material fact* in dispute." (Emphasis added.) It is for the jury to determine the facts and the trial judge to apply the appropriate principles of law to those facts. Whether the Board committed acts that amount to a failure to negotiate in good faith was a question for the trial judge and not the jury.

### III. The Unlawful Act Issue

The Court of Appeals held that the Board had not negotiated in good faith with the SCEA because of its unilateral action in terminating payment of monthly insurance premiums and its refusal to continue deduction of professional dues from teachers' salaries during negotiations. In reaching its decision, the court adopted the rationale of the majority of cases in which this question has been considered under other state public employee labor relations acts. We affirm.

An employer's unilateral change in conditions of employment which are under

---

4. See *Williams v. Van Hersh*, 578 S.W.2d 373 (Tenn.App.1978). In *Williams*, the Court of Appeals points out that

The submission of issues in a jury trial in chancery was formerly governed by T.C.A. § 21–1014, which required the submission of specific issues to the jury. T.C.A. § 21–1014 was repealed by Chapter 565, Public Acts 1972, and the procedure is now governed by Rule 49, Tennessee Rules of Civil Procedure. *Id.* at 375.

Although this appears to conflict with our holding above that the Legislature intended to re-establish the previous law by enacting T.C.A. § 21–1–103 (formerly § 21–1011), we point out that the right to a jury trial in chancery, or the effect of the verdict, is not provided for in the Tennessee Rules of Civil Procedure. See *Ashe v. State ex rel. Shriver, supra.* To the extent proceedings in chancery are not covered under TRCP, the effect of T.C.A. § 21–1–103 is to restore the previous law, otherwise, the TRCP are controlling.

negotiation constitutes a refusal to bargain in good faith under the National Labor Relations Act. *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Courts of other states have considered whether the principles set forth in *Katz* apply to collective bargaining in the public sector and the majority have held that they do.

In the case of *Galloway Township Board of Education v. Galloway Township Education Ass'n.*, 78 N.J. 25, 393 A.2d 218 (1978), the Association filed an unfair practice charge against the Board of Education alleging refusal to negotiate in good faith by its unilaterally withholding payment of an annual salary increment due the teachers represented by the Association. The court cited the above stated rule in *NLRB v. Katz, supra,* and went on to say

> The basis of the rule prohibiting unilateral changes by an employer during negotiations is the recognition of the importance of maintaining the then-prevailing terms and conditions of employment during this delicate period until new terms and conditions are arrived at by agreement. Unilateral changes disruptive of this *status quo* are unlawful because they frustrate the 'statutory objective of establishing working conditions through bargaining.' *NLRB v. Katz, supra,* 369 U.S. at 744, 82 S.Ct. at 1112.

393 A.2d at 230.

In addressing the question of whether to apply the definition of good faith obligation to negotiate as found in cases decided under the National Labor Relations Act, the Supreme Court of Pennsylvania noted that "the present case does not present a situation where there exists a meaningful difference in policy between the NLRA and the [state statute], ... both acts favor the collective bargaining process." *Appeal of Cumberland Valley School District, Etc.*, 483 Pa. 134, 394 A.2d 946, 950 (1978). The facts in that case are similar to the case at bar. During the course of negotiations for a new agreement, the old agreement expired resulting in the school district's termination of payment of health and life insurance premiums. The court held that this constituted a refusal to bargain in good faith and stated that "[t]he duty to bargain in good faith means that the parties must 'make a serious effort to resolve differences and reach a common ground.'" *Id.* (citation omitted).

The stated purpose of our collective bargaining statutes is the establishment and maintenance of professional working conditions and "the highest possible education standards." T.C.A. § 49–5–601. Section 49–5–611 requires the boards of education and professional employee organizations to negotiate in good faith certain conditions of employment. Clearly, our statute favors the collective bargaining process as a means whereby both parties can resolve their differences through open discussion.

In the present case, the Board has paid the total insurance premium for each teacher since the 1976–1977 school year. These payments had been made despite periodic increases in the premiums, and following the increase in May 1982, the full premium was paid through the months of May and June before being discontinued by the Board.

■ As pointed out by the Court of Appeals, the Board is bound by the funding provided by the county government. *Carter County Board of Education Commissioners v. American Federation of Teachers*, 609 S.W.2d 512, 517 (Tenn.App.1980). The court went on to say that in the event of a budgetary problem, the Board may be forced to make a prompt decision with regard to one of the conditions subject to employment; nevertheless, "in such circumstances, it should be incumbent on the school board to show that it had no other choice other than to act quickly and that it did not have an opportunity to first negotiate these matters with the public employee union." Accordingly, absent a justification

of its action, the Board is guilty of a refusal to bargain in good faith.

As to the issue of the Board's decision to terminate the deduction of professional dues, we agree with the Court of Appeals that such action also constituted "an incident of bad faith." Payroll deductions are among the mandatory subjects of negotiation, T.C.A. § 49–5–611(a)(8), and an impasse in negotiations on the subject had not been declared.

At the time these violations occurred, the EPNA did not provide specific remedies. However, we agree with the judgment of the Court of Appeals, that the Board be required to pay the full insurance premiums until it justifies its actions and also to continue making payroll deductions for SCEA members during negotiations.

Accordingly, the Court of Appeals is reversed as to the Open Meetings issue and the finding that the jury verdict in chancery court is advisory only. We affirm the Court of Appeals' conclusion that the Board failed to negotiate in good faith due to its unilateral actions on matters under negotiation. Costs of this appeal shall be divided equally between the parties.

COOPER, C.J., and FONES, BROCK, and HARBISON, JJ., concur.