| | | |
|---|---|---|
| DWAYNE HAWKINS and AL GOSSETT, | ) ) ) | Davidson Circuit No. 96C-2528 |
| Plaintiffs/Appellants, | ) ) | |
| VS. | ) ) | |
| PATRICK A. HART, SUPERIOR MOTORS, INC., NELSON BOWERS, II, and BOWERS TRANSPORTATION GROUP, LLC, | ) ) ) ) ) | |
| | ) | Appeal No. 01A01-9707-CV-00294 |
| Defendants/Appellees. | ) | |

**FILED**

**May 29, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

IN THE COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE

APPEAL FROM THE CIRCUIT COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

HONORABLE BARBARA N. HAYNES, JUDGE

Steven A. Riley, #6258
BOWEN, RILEY, WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
ATTORNEY FOR PLAINTIFFS/APPELLANTS

John P. Branham, #2552
Kathryn Barnett, #15361
BRANHAM & DAY, P.C.
150 Fourth Avenue North
First Union Tower, Suite 1910
Nashville, TN 37219
ATTORNEY FOR DEFENDANTS/APPELLEES,
PATRICK A. HART and SUPERIOR MOTORS, INC.

H. Wayne Grant, #1573
David M. Elliott, #17966
GRANT, KONOALINKA & HARRISON, P.C.
Suite 900 Republic Centre
633 Chestnut Street
Chattanooga, TN 37450
ATTORNEYS FOR APPELLEES, NELSON E. BOWERS, II
and BOWERS TRANSPORTATION GROUP, LLC

**MODIFIED AND REMANDED.**

HENRY F. TODD
PRESIDING JUDGE, MIDDLE SECTION

CONCUR:
BEN H. CANTRELL, JUDGE
WILLIAM C. KOCH, JR., JUDGE

DWAYNE HAWKINS and AL GOSSETT,)
                                 )

      **Plaintiffs/Appellants,**     )

                                 )

**VS.**                         )      **Davidson Circuit**

                                 )      **No. 96C-2528**

**PATRICK A. HART, SUPERIOR**   )

**MOTORS, INC., NELSON BOWERS, II,** )

**and BOWERS TRANSPORTATION**  )

**GROUP, LLC,**                 )      **Appeal No.**

                                 )      **01A01-9707-CV-00294**

      **Defendants/Appellees.**    )

## O P I N I O N

This appeal represents a consolidation of two appeals in the same case by order of this Court entered on October 22, 1997, since which time the captioned number has appeared on all proceedings. These consolidated appeals are from rulings of the Trial Court in a single case involving the efforts of plaintiffs to purchase an automobile dealership. The issues are best understood from a detailed narration of the facts and subsequent proceedings.

Patrick Hart is a wealthy Seattle businessman. In February 1993 he struck up a conversation with Mark Chmelar at a yacht show in Miami. Mr. Chmelar owned automobile dealerships in Nashville and Tallahassee. Mr. Chmelar suggested that Mr. Hart acquire an interest in the Nashville dealership, and Mr. Hart eventually agreed even though he had no prior experience in the automobile business. Accordingly, in November 1993, Mr. Hart acquired a 50% interest in Superior Motors, Inc. Mr. Hart agreed that Mr. Chmelar would continue to manage the day-to-day operations of the dealership. At the outset, the arrangement proved satisfactory enough that Mr. Hart agreed in mid-1995 to purchase an interest in another automobile dealership owned by Mr. Chmelar in Tallahassee, Florida.

First Tennessee Bank informed Mr. Hart in March 1995, that the Superior Motors dealership in Nashville was $1,000,000 out of trust on its floor plan loan. Even though Mr. Chmelar assured Mr. Hart that there were no problems with the dealership, Mr. Hart received another call from the bank in June 1995 stating that the dealership was now $1,600,000 out of

trust. During the next two months, Mr. Hart discovered that Mr. Chmelar had purchased an airplane using Superior Motors credit, that the dealership's tax returns reported that the dealership had sustained a $714,000 operating loss, and that Mr. Chmelar had been paying himself an annual salary of $351,357 rather than the $144,000 agreed upon. Finally, in August 1995, First Tennessee Bank informed Mr. Hart that it intended to call his letter of credit and require him to honor his personal guarantee unless the dealership's financial problems were quickly rectified.

Mr. Hart realized that he was in a precarious situation because the Nashville dealership was $3,500,000 in debt. He decided to get out of the automobile business as quickly as he could and retained James Cameron, a lawyer in Nashville, to assist him in resolving the problem with the Nashville dealership. On September 5, 1995, Mr. Hart faxed Mr. Chmelar a letter stating that he had discovered the financial irregularities at the dealership and that intended to remove Mr. Chmelar as president of the corporation.

In the meantime, Mr. Chmelar had entered into discussions about the sale of the Tallahassee dealership with Dwayne Hawkins, a Florida businessman engaged in the automobile business, and his partner, Al Gossett who lived in Memphis. Mr. Gossett and Mr. Hawkins were interested in purchasing not only the Tallahassee dealership but also the Nashville dealership. On September 7, 1997, Mr. Gossett telephoned Mr. Hart in Seattle to inform him that he and Mr. Hawkins were interested in acquiring both dealerships. Seeing this as an opportunity to get out of the automobile business quickly, Mr. Hart agreed to meet in Memphis on September 10, 1995 to discuss the sale of the dealerships. Mr. Gossett and Mr. Hawkins agreed to make an offer for both dealerships, and during the evening of September 10, 1995, Mr. Gossett telephone Mr. Hart in Nashville to inform him that he would present an offer to purchase the two dealerships the next day.

On the morning of September 11, 1995, Mr. Hart and Mr. Gossett met over breakfast in Mr. Hart's hotel room, and Mr. Gossett presented Mr. Hart with proposed contracts to acquire both the Tallahassee and the Nashville dealerships. After negotiating several of the terms and interlineating several changes in the documents, both Mr. Hart and Mr. Gossett signed two sets of contract documents -one set pertaining to the Tallahassee dealership and the other set pertaining to the Nashville dealership. Each set of documents consisted to an "Agreement for the Purchase and Sale of Assets" and an "Agreement for Interim Management Agreement" [sic]. After Mr. Hart executed the agreements, Mr. Gossett obtained Mr. Chmelar's signature on both sets of agreements.

Mr. Hart and Mr. Gossett met later in the day with Mr. Hart's lawyer, Mr. Cameron. Mr. Hart informed Mr. Cameron "I got this thing solved. Here are two agreements. They're all signed, put to bed, and I can go home." After Mr. Gossett left to go to the Nashville dealership, Mr. Cameron informed Mr. Hart that the contracts were not financially advantageous to him and that he could get a higher price for the dealerships. Later, Mr. Cameron informed Mr. Hart that there was not enough money for Hart in the deal and that "the agreements would not work."

On September 12, 1995, Mr. Cameron sought Mr. Gossett's assistance in convincing Mr. Chmelar to relinquish his stock in the Nashville dealership. Mr. Gossett was willing to help because he maintained a cordial relationship with Mr. Chmelar and because he understood that his contract to purchase the Nashville dealership would be worthless if the bank foreclosed. Mr. Gossett convinced Mr. Chmelar to relinquish his stock for $1,000 and Mr. Hart's agreement to pay their joint obligation to the bank. Mr. Chmelar conveyed his shares to Mr. Hart on September 12, 1995, and on September 13, 1995, Mr. Gossett terminated Mr. Chmelar as president of both dealerships with Mr. Hart's blessing.

On September 14, 1995, Mr. Cameron demanded that Mr. Gossett release the agreements to sell both the Tallahassee and the Nashville dealership. He stated that Mr. Hart would not

consider performing or even amending the agreements unless Mr. Gossett agreed to release the agreements executed on September 11, 1995. Mr. Gossett declined to sign a release.

Mr. Hart eventually sold the Tallahassee dealership to Mr. Gossett and Mr. Hawkins in February 1996 based on an amended version of the agreement signed on September 11, 1995. They never finalized the agreement concerning the Nashville dealership because Mr. Hart had entered into negotiations with Nelson Bowers, II, an automobile dealer from Chattanooga, to sell the dealership for a price higher than the price agreed to in the September 11, 1995 agreement with Mr. Gossett. When Mr. Gossett learned of these negotiations, he informed Mr. Bowers in a June 25, 1996 letter that he was seeking to close his September 11, 1995 contract with Mr. Hart.

On July 8, 1996, Mr. Gossett and Mr. Hawkins filed suit against Mr. Hart and Superior Motors, Inc. in the Chancery Court for Davidson County seeking to enforce the September 11, 1996 contract. They sent a copy of their complaint to Mr. Bowers several weeks later. Despite the notice of the contractual dispute, Mr. Bowers signed a contract on August 16, 1996, to purchase the Nashville dealership. Mr. Bowers later assigned his interest in this contract to European Motors, Inc., a company in which he owns a 50% interest. On September 19, 1996, Mr. Gossett and Mr. Hawkins filed an amended complaint adding Mr. Bowers and Bowers Transportation Group as defendants. On October 17, 1996, Mr. Hart and Superior Motors, Inc. conveyed the assets of the dealership to European Motors, but Mr. Bowers also required Mr. Hart to agree to indemnify him and European Motors against any claims by Mr. Gossett and Mr. Hawkins.

Following substantial discovery, Mr. Hart and Superior Motors, Inc. moved for summary judgment on the ground that the September 11, 1995 Agreement for the Purchase and Sale of Assets was too uncertain and indefinite to be enforced. Specifically, they based their defense on two provisions of the contract -one that left the negotiation of the lease of the premises open for

future negotiation and another providing that the parties would later agree upon a price for the Nashville dealership's inventory of new vehicles. Mr. Hart also asserted that he could not be held personally liable on the contract even though he had signed it as guarantor. Mr. Bowers and his corporations also moved for summary judgment on the constructive trust claim. The trial court granted both motions in orders entered on April 21 and 28, 1997. The trial court reasoned that the September 11, 1995 agreement was too indefinite to be enforceable under Florida law and that impressing a constructive trust on the assets of Superior Motors was not an appropriate equitable remedy. The trial court did not specifically address the issue of Mr. Hart's liability as guarantor of the September 11, 1995 contract.

Summary judgment is not a substitute for the trial of disputed factual issues. *Taylor v. Nashville Banner Publishing Co.*, Tenn. App. 1978, 573 S.W.2d 476; Cert. Den. 441, U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396; *Gonzales v. Allman Constr. Co.*, Tenn. App. 1993, 857 S.W.2d 42.

A summary judgment is to be rendered only when it is shown that there is no genuine issue as to a material fact and that the moving party is entitled to a judgment as a matter of law. *Daniels v. White Consolidated Industries, Inc.*, Tenn. App. 1985, 692 S.W.2d 422; *Blazer Fin. Svcs., Inc., v. Diddle*, Tenn. App. 1983, 648 S.W.2d 257.

On appeal, no presumption of correctness attaches to decisions granting summary judgment, because they involve only questions of law. *Hembree v. State,* Tenn. 1996, 925 S.W.2d 513.

The imposition of sanctions or discretionary costs is subject to the discretion of the trial court, but is also subject to review on appeal, and a reversal is justified where the result is clearly erroneous. *Baker v. Nationwide Mutual Fin. Ins. Co.*, Tenn. App. 1982, 646 S.W.2d 440.

In the order of their priority, the principal issues presented to this Court appear to be as follows:

1. Does the September 11, 1995 agreement for the purchase and sale of the assets of the Nashville dealership evidence an enforceable contract?

(This agreement was executed in Tennessee, its subject matter was Tennessee property and it was to be performed in Tennessee. Nevertheless, paragraph 22 of the agreement provides:

> 22 Governing Law: the laws of the State of Florida shall govern all questions concerning the construction, validity, and interpretation of this agreement.)

In *Truly Nolen Inc. v. Atlas Moving & Storage Warehouse, Inc.*, Fla. App.3d,1961, 125 So.2d 903, a contract requiring plaintiff to pay the cost of "an appropriate advertising sign" was held unenforceable for vagueness as to size or specifications of the sign.

Plaintiff cites *Blackhawk Heating. & Plumbing, Inc., v. Data Lease Fin. Corp.*, Fla., 1974, 302 S.W.2d 404, wherein plaintiff brought a suit for specific performance of an option to purchase bank stock. The Trial Court denied specific performance. The intermediate court affirmed. The Supreme Court reversed and said:

> Data Lease relies upon Truly Nolen, Inc. v. Atlas Moving and Storage Warehouse, Inc., 125 So.2d 903 (Fla.App.3d, 1961), writ discharged 137 So.2d 568 (Fla.1962), which holds that if an agreement is so vague and uncertain in the specifications of the subject matter that the Court cannot identify that subject matter or determine its quality, quantity or price, it will be unenforceable. This case involved "a latent ambiguity in the meaning of an essential word," which was not reconciled by construction of the parties.
>
> - - - -
>
> "[T]he fact that an executed written contract contains within itself difficulties of construction about which the parties disagree does not enable the parties to contend that the minds of the parties never met, since by signing the writing the parties bind themselves to such interpretation as the court may place upon the words and symbols employed by them." 17 Am.Jur.2d, Contracts, § 22, at 359.

[5]    Even though all the details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them. A subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with respect thereto. 17 C.J.S. Contracts § 31.

The aforementioned rule of law has been codified with respect to sales, with the adoption in Florida of the Uniform Commercial Code. Fla.Stat. § 672.2-204, F.S.A. However, the statute relates to a contract for the sale of goods.

> "(1) a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

> "(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undermined.

> *"(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."* (Emphasis supplied.)

- - - -

[7] As Professor Corbin stated in his treatise, Corbin on Contracts, Vol. I (1963), § 97, at 424:

> "If the parties provide a practicable, objective method for determining this price or compensation, not leaving it to the future will of the parties themselves, there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract."

The contract should not be held void for uncertainty unless there is no other way out. As was stated by Justice Cardozo in *Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., Inc.*, 232 N.Y. 112, 133 N.E. 370, 371, "Indefiniteness must reach the point where construction becomes futile."

Again turning to Professor Corbin, he states at § 95, page 400:

> "If parties have concluded a transaction in which it appears they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and

just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left."

Williston on Contracts, (3rd Edition, 1968), Vol. 11, § 1424, page 813, states:

"The law does not favor, but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained."

Processor Corbin again states at § 95, page 396:

"In considering expressions of agreement, the court must not hold the parties to some impossible, or ideal, or unusual standard. It must take language as it is and people as they are. All agreements have some degree of indefiniteness and some degree of uncertainty."

Professor Williston states at page 819:

"It seems probable that the difficulty regarding uncertainty has been overemphasized; *certainly, it should not be allowed to hamper or restrict equitable relief further than necessity requires.*" (Emphasis supplied.)

In *Stone v. Barnes-Jackson Co., Inc.,* 129 Fla. 816, 176 So. 767 (1937), this Court held that specific performance could be granted on an oral contract to execute a lease "in the usual form customarily used in Miami."

The option agreement in the case *sub judice* was not so uncertain in its terms as to require dismissal of the specific performance suit.

*(Blackhawk Heating and Plumbing Co., Inc. v. Data Lease Financial Corp.,* 302 So.2d at 408-09.)

In *Jacksonville Port Authority v. Johnson*, Fla.App. 1993, 624 So.2d 313, a contractor sued the authority upon a work order to repair a crane. The order was later awarded to another contractor. A jury found for the plaintiff. The appellate court reversed and said:

1,2 [w]hile it is not necessary that all details of an agreement be fixed in order to have a binding agreement

-9-

between parties, if there has been no agreement as to essential terms, an enforceable contract does not exist. *Williams v. Ingram*, 605 So.2d 890, 893 (Fla. 1st DCA 1992); *Blackhawk Heating and Plumbing Co., Inc. v. Data Lease Financial Corp.*, 302 So.2d 404 (Fla. 1974).

> So long as any essential matters remain open for further consideration, there is no completed contract. In order to create a contract it is essential that there be reciprocal assent to a certain and definite proposition.

*Mann v. Thompson*, 100 So.2d 634, 637 (Fla. 1st DCA 1958). Failure to sufficiently determine quality, quantity, or price may preclude the finding of an enforceable agreement. *See Blackhawk Heating and Plumbing Co., Inc.* at 408, citing *Truly Nolen, Inc. v. Atlas Moving and Storage Warehouse, Inc.*, 125 So.2d 903 (Fla. 3d DCA 1961), *cert. discharged*, 137 So.2d 568 (Fla. 1962).

[3] Where the parties are continuing to negotiate as to these essential terms, there can be no meeting of the minds. *Central Properties, Inc. v. William H. Robbinson*, 450 So.2d 277, 280 (Fla. 1st DCA 1984), modified, 468 So.2d 986 (Fla. 1985).

[4] In the instant case, while a general understanding may have existed in April of 1989, concerning appellees' continued participation as to phase III of the project, clearly no enforceable contract existed. The scope of the work

contemplated in phase III was not presented until late July of 1989. Additions continued to be made after that time. There was never an agreed-upon price between the parties. Correspondence between the parties indicated that negotiations between the parties as to these essential terms were continuing as late as January 1990. Letters and correspondence from appellee confirm that it still felt that it had not been awarded these projects, but was still seeking acceptance of its proposals. Under these circumstances, no binding agreement existed between the parties.

(*Jacksonville Port Authority v. Johnson*, 624 So.2nd at 315.)

It appears from the foregoing that the statutory and case law of Florida requires that the present controversy be resolved in the light of the intent of the parties as expressed in their written instrument, but the severability of the various undertakings must be decided in the light of the circumstances under which the instrument was signed.

-10-

Appellees insist that the document was hurriedly prepared and signed as an "agreement to agree." Whatever the brief time frame of discussion before signing, it is uncontroverted that there was time to have legal counsel prepare a 10-page document which was signed by the parties after numerous initialed interlineations.

For the purpose of summary judgment, it cannot be found conclusively from the present record that no part of the buy-sell agreement contains a binding contract. Paragraph 21 of Exhibit A reads as follows:

> 21. <u>Severability</u>: Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, and if any provisions of this Agreement are determined to be unenforceable or illegal, such provisions shall be deemed severed from the other provisions which shall remain valid and enforceable.

According to this provision, a part of the agreement may be enforceable even though other parts may not be enforceable.

By paragraphs 1.1, 1.2, 5.1 and 5.2, the parties unequivocally agreed to the sale and purchase of specified vehicles at specified prices.

Unless the parties subsequently agreed upon prices of used cars, it does not appear that a binding agreement exists as to used cars.

Unless the parties subsequently agreed upon a person to inventory the parts and accessories, it does not appear that there is a binding agreement in regard to this asset.

It appears that the parties agreed upon the prices of items mentioned in paragraphs 1.5, 1.6, 5.5 and 5.6.

A problem exists as to the claim against Nelson Bowers, II and Bowers Transportation Group, LLC. Before these defendants can be held liable, it must appear that plaintiffs had an enforceable right to acquire an asset which was acquired by these defendants.

A further problem exists regarding the right of plaintiffs to discover certain documents in the possession of counsel for defendant, Hart, in spite of the asserted attorney-client privilege and other documents in the possession of the banks of Hart and Superior Motors. On April 21, 1997, the Trial Court entered the following order:

> The matter came before the Court upon the motion of Defendants Superior Motors, Inc. and Patrick A. Hart for summary judgment. Based upon the arguments of counsel, the memorandum of law and supporting documents, the Court hereby grants the Defendants' Motion for Summary Judgment and dismisses this case based upon the following findings:
>
> 1.     The parties entered into a contract on September 11, 1995 entitled "Asset Purchase Agreement" that called for the application of Florida law to all questions concerning the construction, validity, and interpretation of the agreement.
>
> 2.     Under Florida law, the provisions of the agreement for the purchase of the assets were too uncertain and indefinite to be enforced. The plaintiffs, therefore, are not entitled to enforce the purchase of the assets under the provisions of the September 11, 1995 agreement.
>
> WHEREFORE, it is hereby ORDERED that the Defendants' Motion for Summary Judgment is granted and this case is dismissed in its entirety with the costs taxed
>
> against the plaintiffs and their surety for which execution may issue, if necessary.

On April 28, 1997, the Trial Court entered the following order:

### ORDER

> The following motions were heard by this Court on December 6, 1996:
>
> 1)     Plaintiffs' Motion to Compel;

-12-

2)    Defendants Superior Motors, Inc.'s ("Superior Motors") and Patrick A. Hart's ("Hart") Motion for a protective Order and to Quash the Subpoena of first Tennessee Bank National Association ("First Tennessee");

3)    Motion of Harwell Howard Hyne Gabbert & Manner, P.C. ("Harwell Howard") to Modify Plaintiffs' Subpoena Duces Tecum;

4)    Motion of Harwell Howard for a Protective Order.

After consideration of the motions, responses, replies and arguments by counsel, this Court ORDERS:

## Plaintiffs' Motion to Compel

With respect to Interrogatory #2 requesting a description of withheld documents, Plaintiff's motion to compel is DENIED at this time. After the deposition of James Cameron, plaintiffs may for good cause re-petition this Court to review in camera the withheld documents and/or to require that defendants provide the Court with a general description of the withheld documents and/or to grant any other further relief.

With respect to Document Production Request #5 requesting personal financial statements, Defendant Hart shall produce his most current financial statement as of September 11, 1995 (including all attachments thereto) that was provided to First Tennessee.

With respect to Document Production Request #22, Defendant Hart shall produce transcripts of all depositions in which he was deposed in any lawsuit that arises from his ownership interest in Superior Motors that are in his possession or in the possession of his past or present attorneys.

## Superior Motors' and Hart's Motion for a Protective Order and to Quash the Subpoena of First Tennessee

With respect to Superior Motors' and Hart's motion to quash and motion for a protective order, the subpoena and notice of deposition of First Tennessee is modified to limit its scope as follows:

1)    to include only documents dated, signed, received, sent out, or created during the period from April 1, 1993 to September 15, 1995;

2)  to exclude all personal financial documents of Hart <u>except</u> the most current personal financial statement of Hart as of September 11, 1995.

### Motion of Harwell Howard to Modify Plaintiffs' Subpoena Duces Tecum

Harwell Howard's motion to modify plaintiffs' subpoena is GRANTED. The subpoena is modified to limit the scope of the subpoena to exclude billing statements sent to Superior Motors and Hart. After the deposition of James Cameron, plaintiffs may for good cause re-petition this Court to review <u>in camera</u> the withheld documents and/or to require that defendants provide the Court with a general description of the withheld documents and/or to grant any other further relief.

### Motion of Harwell Howard for a Protective Order

Harwell Howard's motion for a protective order is GRANTED. Plaintiffs' counsel shall not ask any questions at the deposition of Harwell Howard's custodian of records that are designed to elicit information regarding documents that were withheld on the basis of attorney-client privilege or work product doctrine. After the deposition of James Cameron, plaintiff's may for good cause re-petition this Court to review <u>in camera</u> the withheld documents and/or to require that defendants provide the Court with a general description of the withheld documents and/or to grant any other further relief.

During discovery, Messrs. Gossett and Hawkins submitted interrogatories and a request for production of documents requesting both Mr. Hart and his lawyer to produce documents and other materials that were discoverable under Tenn. R. Civ. P. 26. Mr. Hart responded with a blanket refusal to provide the information on the ground that it was "not required by the Tennessee Rules of Civil Procedure." Even though the defendants indicated that they were withholding two file boxes containing approximately two thousand pages of documents based on their claim of privilege, the trial court declined to order the defendants to identify the documents they were withholding.

The Tennessee Rules of Civil Procedure embody a broad policy favoring the discovery of relevant, nonprivileged information. *See Pettus v. Hurst*, 882 S.W.2d 783, 786 (Tenn. Ct. App. 1993). Since claims of privilege are contrary to the general rule favoring

discovery, *see Jaffee v. Redmond*, 518 U.S. 1, ___, 116 S. Ct. 1923, 1928 (1996), they should be construed narrowly, and the burden of establishing the existence of the privilege is on the party asserting it. *See* 4 James W. Moore, et. al., *Moore's Federal Practice* ¶ 26.11[1] (2d ed. 1996) ("Moore's Federal Practice"). Accordingly, the courts should not permit parties to use a bald assertion of privilege as grounds for a wholesale refusal to participate in discovery. Instead, they should require parties asserting a privilege to provide them with a log or index of the materials being held under a claim of privilege in order to enable them to rule on the privilege claim. *See* 8 Charles A. Wright, et. al., *Federal Practice and Procedure* § 2016.1, at 230-235 (2d ed. 1994); Moore's Federal Practice ¶ 26.11[1].

The purpose of the attorney-client privilege invoked by Mr. Hart is to shelter his communications with his lawyer. *See Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 333 (Tenn. 1984); *Hazard v. Hazard*, 833 S.W.2d 911, 914 (Tenn. Ct. App. 1991); Tenn. Code Ann. § 23-3-105 (1994). Mr. Cameron has become a pivotal fact witness in this case because of his investigation of Mr. Chmelar's activities and his negotiations with Messrs. Gossett and Hawkins and others concerning the various contracts to sell the Nashville dealership. Based on the facts before us, many of his communications do not appear to be privileged. Accordingly, on remand, the trial court should require Mr. Hart to provide an index containing a description of the materials being withheld in order to enable the court to determine whether the claim of privilege is being properly asserted.

The trial court also limited Messrs. Gossett's and Hawkins's discovery of Mr. Hart's and the dealership's records at First Tennessee Bank to the period of April 1, 1993 to September 15, 1995. Tenn. R. Civ. P. 26.02(1) permits the discovery of information that "appears reasonably calculated to lead to the discovery of admissible evidence." The evidence indicates that Mr. Hart and the Nashville dealership continued its relationship with First Tennessee Bank until October 1996. Accordingly, we do not perceive a basis for the

trial court's decision to limit this discovery request. On remand, the trial court should modify its order to permit additional discovery of the First Tennessee Bank records, subject of course to Mr. Hart's right to seek a protective order with regard to specific documents for good cause shown.

Meanwhile, the judgment for discretionary costs is vacated, subject to reinstatement, if justified.

Plaintiffs' fourth issue raises the question of the tort of interference with economic advantage. That question is not controlled by Florida law, but *lex fori,* Tennessee law. In *Nelson v. Martin*, Tenn. 1997, 958 S.W.2d 643, the Supreme Court refused to recognize the tort of interference with prospective economic advantage.

Based upon the present record, the foregoing disposes of the issues presented by the parties as follows:

The purchase of certain assets of the dealership is enforceable despite failure to agree upon the price of other assets.

The agreement imposes individual liability upon Hart as guarantor to the extent of the liability of Superior Motors, Inc.

Under the circumstances of the present case, it was not error for the Trial Court to refuse to impose a constructive trust on assets conveyed to a third party. The equitable remedy of constructive trust is appropriate only when the remedy of damages is unavailable. *Browder v. Hite*, Tenn. App. 1980, 602 S.W.2d 489, and authorities cited therein. Plaintiffs have the remedy of recovery of damages.

Tennessee does not recognize the tort of prospective economic advantages. The Trial Court correctly dismissed the counterclaims of Messrs. Gossage and Hart for interference with prospective economic advantage.

Plaintiffs have a limited right of discovery to be fixed by the Trial Court after further pleading and hearing. As above indicated, the Trial Court in effect reserved judgment upon the claim of confidential privilege awaiting the tender or general description of material claimed to be privileged.

No reversible error is found in the discretionary denial of leave to amend the complaint.

The award of discretionary costs is vacated.

The dismissal of the counterclaim should await further hearings by the Trial Court.

As a result of all the foregoing, the judgment of the Trial Court is modified to conform to the holdings herein, and the cause is remanded to the Trial Court for further procedure in conformity with this opinion. Costs are assessed against the appellees.

**MODIFIED AND REMANDED**.

_____
HENRY F. TODD
PRESIDING JUDGE, MIDDLE SECTION

CONCUR:

_____
BEN H. CANTRELL, JUDGE

_____

WILLIAM C. KOCH, JR., JUDGE