Ben D. BRABSON, Jr.,
Trustee, Plaintiff,

v.

Clive H. VALENTINE and Barbara Gayle Valentine and Bank of Commerce, Defendants.

BANK OF COMMERCE, Cross–Plaintiff, Cross–Defendant, Appellant,

v.

Clive H. VALENTINE and Barbara Gayle Valentine, Cross–Defendants, Cross–Plaintiffs, Appellees.

Court of Appeals of Tennessee, Eastern Section.

Oct. 17, 1990.

Application for Permission to Appeal Denied by Supreme Court Jan. 14, 1991.

Petition to Rehear Application for Permission to Appeal Denied Feb. 25, 1991.

Stephen R. Wise and Barry W. Eubanks, Knoxville, for cross-plaintiff, cross-defendant, appellant.

William B. Felknor, Maryville, for cross-defendants, cross-plaintiffs, appellees.

OPINION

GODDARD, Judge.

This case has been before this Court on a previous appeal. In the former opinion this

Court stated the posture of the case as follows:

This suit was commenced on November 25, 1986. It originated as a bill of interpleader, filed by Ben D. Brabson, Jr., Trustee under a deed of trust executed by Clive H. Valentine and wife, Barbara Gayle Valentine, to secure an indebtedness owed Southern Industrial Banking Corporation which later merged, as a result of a bankruptcy proceedings, with the Bank of Commerce, subsequently renamed Bank of East Tennessee. By agreement of the parties, the trust deed was foreclosed, resulting in net proceeds of $76,384, which were paid into court by the Trustee.

The Bank filed an answer contending they were entitled to the funds deposited, and also a cross-claim against the Valentines seeking the balance owing on the indebtedness represented by the promissory note in the original amount of $313,297.08.

The Valentines filed an answer contending that they were entitled to the proceeds deposited and an answer to the cross-claim, contending that the note was void and illegal as usurious and violative of a number of State and Federal Statutes. They also filed a cross-claim asking that the note "be declared void and cancelled," and in the alternative for a judgment against the Bank in the amount of $100,000, as evidenced by an investment certificate issued by SIBC to Mrs. Valentine.

Being of the opinion that under the doctrine of *res judicata* a judgment of the Bankruptcy Court precluded the Valentines from asserting any of their contentions, the Chancellor first sustained the Bank of East Tennessee's motion for summary judgment as to the funds interpleaded, and thereafter its motion for summary judgment as to the balance owing on the note. He thereupon granted judgment in the sum of $192,145.44.

This Court found that the defense of *res judicata* only reached the alternative relief sought by the Valentines, and remanded the case for trial as to their principal claims.

Upon remand the Trial Court dismissed the counter-complaint of the Bank and awarded the funds to Mrs. Valentine, now White, who under the terms of a divorce decree entered during the pendency of this suit, was awarded sole rights in this litigation. For convenience we will continue to refer to her as Valentine rather than White.

The Bank appeals insisting the Court was in error in finding that the note was usurious, in finding even if the note was usurious that the Bank could not recover the principal amount plus legal interest, in finding that violation of the statute relative to usury and investment certificates precluded the Bank from recovery, and in giving a second setoff of the investment certificate against the promissory note.

At the outset we should note, as did the Chancellor, that there is no indication that the Bank has acted in anywise except with the utmost good faith. However, it was stipulated below that the Bank was not a holder in due course of the note and any rights and defenses available to the Valentines against SIBC are available against the Bank.

On May 1, 1982, the Valentines entered into a contract to purchase 58 acres in Sevier County. The contract was contingent upon the Valentines being able to secure financing for the purchase price.

Prior to execution of the sales contract the Valentines, at the instance of the real estate agent, traveled to Maynardville to consult with officials of SIBC regarding a loan for the entire purchase price. When SIBC learned that the Valentines owned a certificate of deposit in the amount of $100,000 with a Savings and Loan Association in Seattle, Washington, it required as a prerequisite for making the Valentines' loan that upon the certificate of deposit maturing on June 7, they purchase an investment certificate in SIBC in that amount.

There is testimony that SIBC policy forbade requiring purchase of investment certificates as a prerequisite to obtaining a loan, but the testimony of the Valentines in

this respect is undisputed and is buttressed by the fact that—rather than take a security interest in the Seattle certificate of deposit—the loan closing was delayed until the certificate of deposit matured.

The loan was ultimately closed on June 8, 1982, when a note and deed of trust was executed by the Valentines. The note was in the total amount of $313,297.08 and was to be paid in 114 equal installments of $2748.22 to begin on December 10 of the same year. The note discloses that the cash advance was $126,340[1] and that finance charges, which included pre-paid interest and pre-paid service charges, total $186,843.08. The note further recited the annual percentage rate was 20.51 percent.

On the date the loan was closed the Valentines purchased an investment certificate in the amount of $100,000 maturing six months after date, with interest to be paid at the rate of 16 percent per annum. Thereafter, a second investment certificate was issued to them in a like amount with an interest rate of 12 percent per annum, which was also payable in six months. The second certificate was dated December 30, 1982. There is no explanation as to the hiatus period between the time the first one matured and the second one issued. Nor in view of Mrs. Valentine's testimony that she did not endorse the first certificate is there any satisfactory explanation of her name appearing thereon as an endorsor with the initials P.C. thereunder.

Sometime after execution of the sales contract but before the property was transferred, a building on the property burned and an insurance company check dated September 20, 1982, in the amount of $14,900 was paid to the Valentines and "Southern Industrial Bank." This amount was credited to the note by SIBC on October 14. No other payments were made by the Valentines on the note except three late charge items totaling $412.18, which were paid on October 7, 1983.

■ As to the first issue, the Bank presented two witnesses who had examined the note and, after entering the appropriate figures into a calculator with a formula

which one witness testified is used to determine interest rates, concluded the interest was precisely 18 percent, the maximum legal interest on the date of the loan. One of the witnesses, an employee of the Department of Financial Institutions of the State of Tennessee, attempted to explain the discrepancy in his testimony and the 20.51 percent interest rate appearing on the note by stating that it met the requirements of Regulation Z, which is not a part of the record.

It appears from the brief of the Bank that the discrepancy may be explained by reference to the following Code Section:

*45–5–102. Definitions.*—As used in this chapter:

(1) "Actuarial method" means the method of allocating payments made on a debt between the principal and interest pursuant to which payment is applied first to accumulated interest and any remainder is subtracted from, or any deficiency is added to, the unpaid principal balance of the debt.

In our view, however, this provision applies only where monthly payments are made or are due, not as here where payments do not begin until five months after the loan.

Moreover, we question whether it was the legislative intent that the interest on payments not made when due become principal for the purpose of calculating interest. Our uncertainty in this regard is because in our view acceptance of the Bank's assertion would lead to anomalous results. For example, say in the instant case the payments were to be made beginning one month after the date of the loan. If in fact the payments were made when due, the note would be usurious exceeding the 18 percent. If, on the other hand, the debtor failed to pay the payments for five months, the loan would be non-usurious because the interest accruing would be considered principal for the purpose of calculating interest.

Finally, we believe the matter is laid to rest by *Continental Bankers Life Insur-*

---

**1.** The $340 was for recording fees and the like.

ance Company of the South v. Bank of Alamo, 578 S.W.2d 625 (Tenn.1979). In that case the Supreme Court was faced with a similar situation wherein the lending institution required purchase of a $50,000 investment certificate to secure a $100,000 loan. Justice Fones, speaking for the Court, found the interest in question usurious and in doing so reasoned as follows (at page 636):

> [T]he borrower paid 9½% per annum on $50,000 of the bank's money and 9½% on $50,000 of its own money, and received 5½% interest on its own money, or a net return to the bank of 4% on the $50,000 of the borrower's money. Thus, the borrower paid, and the bank received, 13½% interest for the use of the bank's money, a usurious rate. T.C.A. § 47–14–104. The illegal act of usury dispels, as a matter of law, any claim of equity in favor of the Bank of Alamo. See 1 Gibson's Suits in Chancery § 51 (5th ed. 1955).

Applying the foregoing reasoning to the case at bar, it would appear that the most that was loaned to the Valentines of the Bank's money was the amount over $100,-000, that is $26,000, plus certain recording fees in the amount of $340 and even as to the $26,340 loaned, $14,900 was repaid by the insurance check within four months.

Responding to the foregoing case, the Bank makes two insistences. First, it says that the quoted language from Bank of Alamo is dicta and correctly asserts that dicta is not a binding precedent. We agree with counsel, but in our view the dicta in that case is well reasoned and good law and we choose to follow it. Secondly, the Bank says that the Legislature completely revamped the Banking and Usury Statutes in 1979. While this may very well be true, counsel fails to point out to us in anywise how any section of the revised statute would in anyway impinge upon the reasoning of Justice Fones.

Finally, as to this point, the Chancellor was less than satisfied with the credibility of the witnesses presented by the Bank and commented on their testimony as follows:

> From the testimony offered, there appears to be several methods by which to attempt to determine the maximum effective rate of interest charged in a given situation and which results in differing answers. Two experts testified that the interest rate charged on the loan here in issue was within permissible statutory limits but on cross-examination were unable to fully justify such calculations, particularly as to the statute TCA 45–5–401, definition of the same. The Court is unable to fully accredit the testimony of such experts.

We conclude in view of the foregoing that the evidence preponderates in favor of the Chancellor's finding that the note in question was usurious.

■ Mrs. Valentine contends that because SIBC required them to purchase an investment certificate and the note was usurious the transaction is void and cites numerous cases in support of this position.

On the other hand, SIBC contends, and also cites numerous cases in support, that even if usury is found the proper practice is to excise the usury and permit a judgment for the principal amount and legal interest. It also contends that the statute relied upon by Mrs. Valentine is one delineating the powers of a loan and thrift company and insists that if it exceeds the authority granted by statute the act is ultra vires but not void. The Bank also denies that violation of either Code Section subjected SIBC to criminal penalties.

On June 8, 1982, the Code Sections relative to interest and investment certificates provided as follows:

> 45–5–301. General powers of registrants.—Any registrant under this chapter shall have the following powers:
>
> (1) To lend money, with or without security, and to take as security real or personal property, or both;
>
> (2) To charge interest at a nominal rate not in excess of seven and one-half percent (7½%) per annum, deducted in advance, on the total amount of the loan for the full term thereof without regard to the payment schedule; but no interest shall be charged in excess of a maximum effective rate of eighteen percent (18%) per annum; and interest shall be con-

tracted for and computed in accordance with § 45–5–401.

*45–5–302. General limitations on registrants.*—No registrant under this chapter shall have the power to:

. . . .

(4) Require the purchase of its investment or thrift certificates by a borrower simultaneously with a loan transaction.

The Penalty Statute, 45–5–106, provides the following:

*45–5–106. Violation of provisions a misdemeanor—Penalty.*—Any person who shall willfully violate the provisions of this chapter shall be guilty of a misdemeanor and upon conviction thereof shall be fined not less than one hundred dollars ($100) nor more than one thousand dollars ($1,000), or be imprisoned in the county jail or workhouse for some period less than one (1) year, or by both such fine and imprisonment in the discretion of the court.

Both the Usury Statute and the one relative to investment certificates are indisputably a part of Chapter Five, the violation of which constitutes a criminal act.

The Bank's argument regarding the acts being *ultra vires* leads it to assert that violation of the Code Sections on usury and investment certificates were not intended to be made criminal acts. This argument might have some appeal were it not for other prohibited acts under 45–5–302, which the Legislature undoubtedly intended to be a crime:

(8) Accept or procure willfully and knowingly a false financial statement from a borrower;

(9) Use any unreasonable collection tactics which shall include, but not be limited to, any conduct by such registrant or any employee or agent thereof which:

(A) Causes the borrower or any member of his family to suffer bodily injury or physical harm;

(B) Constitutes a willful or intentional trespass by force of the borrower's home or his personal property therein, without process of law;

(C) Holds up the borrower to public ridicule or unreasonably degrades him in the presence of his neighbors or business associates.

Whether the violation of the statute declared by the Legislature to be a criminal act voids the transaction, as insisted by Mrs. Valentine, or does not, as insisted by the Bank, need not be decided in resolution of this case. We reach this conclusion because the Trial Court did not void the transaction, but rather applied the Clean Hands Doctrine, and held that the Bank's claim for relief in Chancery Court would be repelled because of SIBC's acts in the premises.

Our review of the record persuades us this is an appropriate case for the application of the doctrine and the Trial Court's resolution was warranted.

As to the fourth issue relative to setoff, we first observe that the Trial Court did not grant any setoff, and in the second that our affirmance of the Trial Court's judgment renders this issue moot.

For the foregoing reasons the Trial Court is affirmed and the cause remanded for such further proceedings, if any, as may be necessary and collection of costs below. Costs of appeal are adjudged against the Bank.

FRANKS, J., and JOHN K. BYERS, Special Judge, concur.