**DABORA, INC., Plaintiff/Appellee,**

v.

**Gail KLINE, Defendant/Appellant.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

May 20, 1994.

Permission to Appeal Denied by Supreme Court Sept. 6, 1994.

John T. Bobo, Diane M. Segroves, Bob, Hunt & Bobo, Shelbyville, for plaintiff/appellee.

R.C. Whiteaker, Adams & Whiteaker, P.C., Frank C. Gorrell, Bass, Berry & Sims, Nashville, for defendant/appellant.

## OPINION

CANTRELL, Judge.

This case involves the enforcement of a covenant not to compete in a contract of employment. In accordance with the covenant, the trial court enjoined the appellant for three years from working for any publication in competition with *Saddle Horse Report,* a highly specialized periodical produced by her former employer. The appellant argues that the covenant is overly broad, and that in any case, it does not apply to her subsequent employment with Richfield Video, because that company's video product should not be considered a "publication in competition with the *Saddle Horse Report.*" We do not agree with either of these contentions, and we accordingly affirm the order of the trial court.

### I.

*Saddle Horse Report* is one of three equestrian magazines published by appellee Dabora Inc. It has been in existence for about twenty-five years, and its current national circulation is approximately 3700 weekly. The magazine contains articles on horse shows and other topics of interest to owners of the Saddlebred and Morgan breeds of show horses, but the majority of its pages are paid advertisements. Most of these advertisements feature full-page photographs of champion Saddlebred and Morgan horses being ridden by their owners, with the names and phone numbers of the owners printed below.

Appellant Gail Kline was working part-time at Rich's department store in Atlanta, Georgia when her professional association with Dabora began. Ms. Kline had been an owner and fan of American Saddlebred horses for many years. In the fall of 1990, she began selling advertising, and writing stories for *Saddle Horse Report,* on a part-time commission basis.

Apparently, Ms. Kline performed her work well. She was promoted to "super-correspondent," and continued to sell advertising and to write part-time. In June of 1991 she moved to Shelbyville, Tennessee to expand the scope of her employment with *Saddle Horse Report.* In October of that year she became a full-time permanent employee.

Soon after moving to Shelbyville, Gail Kline signed a one-year contract of employment with Dabora which, in accordance with that company's standard practice, contained a non-compete clause that read as follows:

"3. That Kline does further hereby covenant:

A. . . .

B. . . .

C. That Kline will not within three (3) years from the date of the termination of this Contract of Employment accept employment, own, or be interested in, directly or indirectly, in any capacity with any other company or organization publishing a Saddlebred or Morgan publication, magazine, newspaper, trade journal, etc. or any publication in competition with the SADDLE HORSE REPORT."

Gail Kline entered into two more annual employment contracts during her employment at Dabora, each containing the non-compete clause printed above. She received several raises, and was earning $23,500 per year when she left. On May 11, 1993 she quit her job with Dabora and accepted em-

ployment selling video advertising for *Revue*, which publishes video accounts of Saddlebred and Morgan horse shows on a monthly basis. *Revue* is produced in Shelbyville, Kentucky, and Ms. Kline moved there from Shelbyville, Tennessee.

Almost immediately thereafter, Dabora sought and was granted a temporary injunction to prevent Ms. Kline from working for *Revue* or any other company or business in competition with *Saddle Horse Report*. Ms. Kline then took a clerical position with Richfield Video Productions, the parent company of *Revue*. On August 19, 1993, the temporary injunction was made . permanent, and expanded to cover her employment with Richfield Video Productions. Ms. Kline moved this court to stay the injunction pending her appeal, citing the financial hardship that strict enforcement of the injunction would impose on her. On October 5, 1993, we stayed the injunction to the extent that it prohibits the appellant from .accepting employment in a non-selling role with Richfield Productions.

In the appeal currently before us, Ms. Kline contends that the covenant is overly broad and oppressive, and that the trial court erred in not ruling that it was therefore void and unenforceable.

## II.

■ The courts of this state have had many opportunities to consider the validity of non-compete agreements. While it is often repeated that such covenants are not favored by law as being in restraint of trade, the courts have not hesitated to uphold them where the restrictions contained in the covenant are found to be reasonable. See *Matthews v. Barnes*, 155 Tenn. 110, 293 S.W. 993 (1927). *Ramsey v. Mutual Supply*, 427 S.W.2d 849, 58 Tenn.App. 164 (1968).

■ There is no inflexible formula for determining reasonableness, but the Supreme Court has indicated some factors which should be considered in making the determination. "Among these are: the consideration supporting the agreements; the threatened danger to the employer in the absence of such an agreement; the economic hardship

imposed on the employee by such a covenant; and whether or not such a covenant should be inimical to public interest." *AllRight Auto Parks Inc. v. Berry*, 219 Tenn. 280, 409 S.W.2d 361 at 363 (1966).

Adequacy of consideration and questions of public interest are not relevant factors in this case, so they require no further discussion here. The focus of our inquiry must be, therefore, to balance the employer's need to be protected from the dangers of unfair competition against the employee's right to practice her trade and earn a living. See *Hasty v. Rent–A–Driver, Inc.*, 671 S.W.2d 471 (Tenn.1984). *Selox Inc. v. Ford*, 675 S.W.2d 474 (Tenn.1984).

■ It would be contrary to our commitment to the freedom of the marketplace to allow an employer to use a restrictive covenant to prevent ordinary competition from former employees. To enforce a covenant not to compete, the employer must be able to show the presence of special facts above and beyond ordinary competition that would give an unfair advantage to the employee when competing with her former employer. *Hasty v. Rent–A–Driver, Inc.*, 671 S.W.2d 471 (Tenn.1984). We believe such special facts are present here.

■ Judging from the editorial content of *Saddle Horse Report* and *Revue*, the business aspects of the saddlehorse industry are secondary considerations to most of the horse owners who participate in it. Though owners may buy and sell horses, and spend large sums of money on stables, trainers and grooms, their primary goal does not appear to be profits, but rather the opportunity to improve their horsemanship, and to associate with other like-minded "horse people" in a shared interest and life style.

The proof shows that the ability to create and maintain personal relationships with the 600 or so significant players in the rather small world of saddle horse enthusiasts is the most important requirement for the successful sale of advertising. While Ms. Kline's experience as a horse owner did bring her into contact with others in the field, it was her association with *Saddle Horse Report* that gave her extraordinary access to, and

knowledge of the owners and trainers who are the primary advertising clients of *Saddle Horse Report, Revue,* and other publications.

The Supreme Court has observed that "[r]estrictive Covenants have been held reasonable where the employee closely associates or has repeated contact with the employer's customers so that the customer tends to associate the employer's business with the employee." *Hasty v. Rent–A–Driver, Inc.,* 671 S.W.2d 471 at 473 (Tenn.1984) (referring to *Matthews v. Barnes,* 155 Tenn. 110, 293 S.W. 993 (1927), and *Hospital Consultants, Inc. v. Potyka,* 531 S.W.2d 657 (Tex. App.1975). That appears to be the situation here.

We do not wish to minimize the importance of the social skills and the innate ability that Ms. Kline undoubtedly brought to the sale of advertising for Dabora. But we also cannot ignore the fact that doors were opened for her because horse owners care about what *Saddle Horse Report* prints about them and their animals. By virtue of her association with that magazine, she was able to quickly develop close personal relationships with many of the major players in the saddle horse industry. It would subject Dabora to unfair competition if she were now able to use those contacts for the benefit of a competing publication.

### III.

The scope of a covenant is another factor that must be considered when determining whether or how to enforce it. To be enforceable, the restriction must not be overly broad in its geographic scope, or in the time period during which it applies. If it is overly broad, the court may be determine that it is totally void, or that it is enforceable, but only to the extent of reasonable territorial and time limitations. See *Ramsey v. Mutual Supply,* 427 S.W.2d 849, 58 Tenn.App. 164 (1968); *Central Adjustment Bureau v. Ingram,* 678 S.W.2d 28 (Tenn.1984).

The geographic scope of the covenant in this case may at first glance seem extremely broad, as it covers the entire country. However the proof shows that *Saddle Horse Report* is one of six or seven publications in the field with a national scope. These publica-tions cover major horse shows regardless of where in the nation they are held; owners advertise their prize-winning horses in them regardless of their place of residence. A sample issue of *Saddle Horse Report,* which is a supplemental exhibit to the record on appeal, includes advertisements for horses stabled in Missouri, Illinois, Arizona, Minnesota, Kentucky, North Carolina, Georgia, Wisconsin, Arkansas, Virginia, Indiana, Florida, Pennsylvania, New Hampshire and California.

It appears that in the field of equestrian publishing, the relevant territorial inquiry does not involve geography so much as it does breed. As the covenant only prohibits Ms. Kline's employment by Saddlebred and Morgan publications, we agree with the trial court that it is not overly broad. She is not prevented from seeking employment with publications covering quarter horses, walking horses, or other breeds, or publications of a more general nature. The restriction is no broader than it needs to be to protect Dabora from unfair competition.

### IV.

Ms. Kline argues that even if we uphold the covenant, it should not apply to her employment with *Revue,* because it is not a "publication in competition with *Saddle Horse Report.*" We disagree. First, we reject the contention that *Revue* should not even be considered a publication because it is embodied in a medium other than print.

A sample issue of *Revue* has been made a part of the record on appeal. The product bills itself as "A Show Horse Video Magazine," thus making explicit the connection between it and printed publications. Like a magazine, it is composed of "articles" interspersed with advertisements. The human and equine interest features included pieces on a horse show, on personalities and stables in the world of saddlebred horses, and a feature by a vet on checking a horse's vital signs. The 30 second advertisements show prize-winning horses in motion, and contain information on how to contact the owners.

The format of *Revue* is strikingly similar to that of *Saddle Horse Report,* and it is

clear from an examination of the two, as well as from trial testimony, that both cater to the same specialized market, and that both pursue the same limited advertising dollars. The appellant contends that because some of the same horses have been advertised in both media at the same time, they are not really in competition with each other. We believe, however, that the duplication merely underlines the fact that both publications are soliciting the same clients. The existence of some possible flexibility in the advertising budgets of those clients does not negate the fact of competition.

## V.

We have determined that non-enforcement of the covenant would subject the appellee to unfair competition, but we have not yet addressed the hardship that the appellant will suffer if the covenant is strictly enforced. Apparently *Revue* made her a lucrative offer to join their staff. When she was temporarily enjoined from working for *Revue*, Ms. Kline went to work as a receptionist for Richfield Video, for considerably less money than she was earning at the end of her association with Dabora.

Richfield Video is the official videographer for many horse shows, and it supplies videotapes for a fee to horse owners who wish to have a record of their steed's performance. Portions of these videos may also find their way into the articles and advertisements in *Revue*. Richfield Video and *Revue* share the same ownership and telephone number, and they occupy offices in the same building. Ms. Kline's paychecks from both *Revue* and Richfield Video were drawn against the same checking account.

In his memorandum opinion, the trial judge found that after the temporary injunction, Ms. Kline continued to attend American saddlebred shows, to circulate back in the barn area after shows, and to talk to friends, who as owners of winning horses are also prospective advertising clients of both *Saddle Horse Report* and *Revue*. The trial court found this to be "a transparent effort to avoid the temporary injunction," concluding that "the restriction must be as broad as 'in

any capacity' in order to prevent the use of just this sort of subterfuge." In his final order, the trial judge extended the injunction to employment of any kind with Richfield Video Productions.

We are aware that enforcement of the injunction does impose a financial hardship on the appellant, the more so in that other comparable job opportunities may not exist in Shelbyville, Kentucky where she now lives. But we are also mindful of the fact that the appellant voluntarily left her job with the appellee; that she was aware that she had signed the covenant not to compete; and that the owner of Dabora Inc. warned her that he would not waive the covenant but would strictly enforce it. Further, he offered to find temporary work for Ms. Kline, if she did not want to work for Dabora any longer, but was unsure about what she wanted to do.

Even though Ms. Kline was clearly given notice of the possible consequences to her of taking a job with *Revue*, she did so anyway, and moved to Kentucky, apparently under the mistaken impression that the covenant could not be enforced against her. There is a limit to what this court may do to protect an individual from the consequences of her own actions. Under these circumstances of this case, we do not believe that the financial hardship to the employee outweighs the employer's right to be free of unfair competition.

## VI.

■ Appellant also objects to the manner of trial in this case asserting that she was denied her right to a trial by jury and to a general jury verdict.

The record shows that Ms. Kline demanded a trial by jury and a general jury verdict in accordance with the procedures set out in Tenn.R.Civ.P. 38.02 and 49.03. The court agreed to empanel a jury to resolve a limited number of fact issues, but reserved the legal issues for hearing before the court only. The court also held that the Rules of Civil Procedure do not create a right to a general verdict by a jury where none existed before.[1]

---

1. Except for the absence of any factual issues

and the waiver which we discuss later, we think

In his opening statement to the jury, counsel for Ms. Kline made repeated references to matters that by previous agreement were reserved for the court alone. The court admonished counsel several times to confine his remarks within appropriate bounds, but to no avail. The court then declared a mistrial as to the jury's portion of the case, and ordered the trial to continue as a bench trial, with any factual issues remaining to be submitted to another jury. At the conclusion of the bench trial, the trial judge ruled that the case presented no material issues of fact that required the services of a jury.

We pretermit the question of whether the appellant had a right to a trial by jury in this case because we find that the appellant, through her counsel, waived any such right she may have had at the end of the trial:

> THE COURT: I think the first thing, however, that we need to deal with today is it still appears to me that there are no factual issues and no reason for a Jury to hear the factual issues, but I want to hear you just right now on that specific question before we get into any closing statements you want to make on other issues. Did anyone hear any factual issues come out today?

> COUNSEL: Your Honor, I think that the factual issues that we stated in our memorandum of the 12 which we discussed earlier today should now under the circumstances under which this trial has proceeded be answered by the Court.

> THE COURT: All right, sir.

The appellant argues that she had no choice but to waive her right to a jury trial because insistence on her right would have delayed the resolution of the case. She points to economic constraints resulting from the application of the temporary injunction, which required that she dispose of the case in the most expeditious way possible.

We are of the opinion, however, that it was her counsel's attempt to improperly place before the jury questions that were by agreement for the trial court alone that placed her in the dilemma in which she found herself. Under these circumstances, we find that she waived any right to a jury that she may have had.

## VII.

No issues having been raised in this appeal that require reversal or modification of the injunction ordered by the trial court, we therefore affirm that order. We also dissolve the partial stay of the injunction that we granted pending this appeal. We remand the case to the trial court for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant.

TODD, P.J., and THOMAS W. BROTHERS, Special Judge, concur.

---

that Ms. Kline would have been entitled to a jury trial and possibly to a general verdict. Tenn. Code Ann. § 21–1–103 provides for jury trials in chancery in cases like this one to determine any material fact in dispute. The verdict is not advisory, *Smith County Educational Assoc. v. Anderson*, 676 S.W.2d 328 (Tenn.1984), and in a prior version the statute gave the jury's verdict

the same effect as a common law verdict. *See Bauman v. Smith*, 499 S.W.2d 935 (Tenn.App. 1972). The Supreme Court has held that in re-enacting the statute the legislature intended to restore the law to its prior status. *Smith County Educational Assoc. v. Anderson*, 676 S.W.2d 328 (Tenn.1984).