IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 7, 2000 Session

## SERVPRO INDUSTRIES, INC. v. STEPHEN PIZZILLO

**Appeal from the Circuit Court for Sumner County**
**No. 18788-C      Arthur E. McClellan, Judge**

---

**No. M2000-00832-COA-R3-CV - Filed February 14, 2001**

---

The trial court granted all of a franchisor's claims against its former franchisee, and dismissed all the franchisee's counterclaims. Among other things, the court found that after the expiration of his franchise, the franchisee had entered into a competing business, in violation of an enforceable non-compete clause in the franchise agreement, and enjoined the franchisee from any further violations. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. and WILLIAM B. CAIN, JJ., joined.

Robert Zarco and Robert M. Einhorn, Miami, Florida, and Walter H. Stubbs, Gallatin, Tennessee, for the appellant, Stephen Pizzillo.

Lawrence C. Maxwell and W. Edward Ramage, Nashville, Tennessee, for the appellee, Servpro Industries, Inc.

## OPINION

### I.
#### THE CREATION AND TERMINATION OF A FRANCHISE

Servpro Industries is a Nevada Corporation that has its principal place of business in Gallatin, Tennessee.  Servpro provides professional cleaning, deodorizing, damage restoration and related services to residential and commercial customers through over 900 franchisees who operate under the Servpro name, using methods and standards developed by the franchisor.

In August of 1993, Stephen Pizzillo signed a franchise license agreement with Servpro for a term of five years. The agreement authorized Mr. Pizzillo to operate a Servpro cleaning and restoration business, and assigned the appellant a "non-exclusive territory" in Fort Lauderdale, Florida. Mr. Pizzillo operated his business under the name "Servpro of Fort Lauderdale."

The total cost of the Servpro franchise and the related Servpro equipment package was $36,000. Mr. Pizzillo made a $15,000 down payment, and financed the balance of the price by signing a security agreement and a note obligating him to make monthly payments to Servpro industries until October of 1999. The note carried an interest rate of 13.5%. In addition to the acquisition price, the contract required the franchisee to pay royalty fees based on a percentage of the gross revenues generated each month by the franchise.

The franchise license agreement contained a non-compete clause which provided that the franchisee would not "divert or attempt to divert" any Servpro customer to any competitor and that he would not,

> "own, maintain, operate, engage or participate in, either directly or indirectly, or have any financial interest, either as an officer, agent, employee, principal, partner, director shareholder or in any other individual or representative capacity, in a corporation, partnership or other entity, which engages in the same or similar business to [Servpro] or which provides Related Services or is otherwise competitive with the business of FRANCHISOR or other SERVPRO franchises . . . ."

The non-compete agreement stated that it applied within the operator's "Operating Territory" and within a 25 mile radius thereof for a period of two years after the termination of the license agreement, and that the two year term would be extended for any period of noncompliance.

At the time Mr. Pizzillo entered into the franchise agreement, he also signed an agreement to follow the guidelines set forth in the appellee's Territorial Policy. The policy provided that,

> "License agreements limit Franchisees to a particular territory and require compliance with a 'territorial working agreement' or 'Territorial Policy.' This 'Policy' sets forth a Franchisee's right to perform work under the 'territorial working agreement' or 'Territorial Policy.' It also prescribes the conditions under which a Franchisee may advertise, solicit, and perform services outside of the licensed territory. No advertising, solicitation, or performing of work outside of the licensed territory is permitted, unless authorized by this Policy.

> . . .

> "If SERVPRO in good faith believes this Policy or the License Agreement has been violated, SERVPRO may eliminate various rights under the Territorial Policy as an enforcement measure. This may be done by only SERVPRO."

. . .

"SERVPRO may, in its sole discretion, decline to assess penalties or use any other enforcement measures permitted by this Policy. Any violation of this Policy is a violation of the Franchisee's License Agreement."

Much of the current dispute arose as a result of alleged violations of the territorial policy by a franchisee whose territory adjoined that of Mr. Pizzillo. Larry Tzucanow, the owner of Servpro of Oakland Park, Inc., allegedly solicited business from insurance agencies within Mr. Pizzillo's territory, and slandered Mr. Pizzillo's own operation to them. According to Mr. Pizzillo, Servpro of Oakland Park often did inferior work, which damaged the reputation of Servpro's services with his own potential customers.

Mr. Pizzillo complained to Servpro about the activities of Mr. Tzucanow on numerous occasions. The record indicates that Servpro reprimanded Mr. Tzucanow, but that it did not take any other action against him with regard to Mr. Pizzillo's complaints. Those complaints were most frequently directed to Larry Coken, who was Servpro's trainer and supervisor in that area of South Florida. Mr. Coken also operated Servpro of Hollywood, Inc. as a franchisee. Mr. Pizzillo claimed that Servpro of Hollywood also infringed on his territory from time to time. For his part, Mr. Coken complained to Mr. Pizzillo about several violations of the territorial policy by Servpro of Fort Lauderdale.

In June of 1998, Mr. Pizzillo ceased making royalty and note payments due under the Franchise License Agreement. At the time the license agreement expired in August of 1998, he owed unpaid royalties in the amount of $3,191.27 for the months of June, July, and August. As of December 31, 1999, he also owed a balance of $3,960.99 on the note.

Alice Harry, Mr. Pizzillo's wife, had worked for her husband's franchise without compensation. In May of 1998, a few months before the expiration of the Servpro agreement, she incorporated a business called American Restoration Network (ARN). That company operates within the boundaries of the territory that had been assigned to Servpro of Fort Lauderdale, and provides contracting and restoration services, including water and fire damage restoration. In October of 1998, Mr. Pizzillo began working for ARN.

## II.
### PROCEEDINGS IN THE TRIAL COURT

On August 8, 1998, Servpro filed an action against Mr. Pizzillo for the amounts owed under the franchise license agreement. The franchisor later filed an amended complaint, which added several counts of breach of the noncompete clause, and asked the court to enjoin Mr. Pizzillo from violating the post-termination provisions of the agreement.

On January 12, 1999, Stephen Pizzillo filed his answer and counterclaim. He alleged that the Servpro was in breach of contract for failure to enforce the territorial policy against other franchisees, failure to provide adequate training, and failure to support and enhance the reputation of the franchise system. Mr. Pizzillo later amended his counterclaim to add a claim for usury under Tenn. Code Ann. § 47-14-103.

Servpro filed a Motion to Dismiss the Amended Counterclaim. On December 3, 1999, the trial court conducted a hearing on the motion, and subsequently dismissed two of Mr. Pizzillo's claims. The court held that Mr. Pizzillo did not have a claim against Servpro for the franchisor's failure to take steps against violations of its territorial policies by other franchisees, because the contract explicitly gave Servpro discretion as to whether or how it dealt with any such violations. The court also found that the contract did not require Servpro to support and enhance the reputation of the Servpro system in Mr. Pizzillo's market territory.

On December 21, 1999, Servpro filed a Motion for Summary Judgment on all its claims and all of Mr. Pizzillo's remaining counterclaims. On January 26, 2000, the trial court heard oral arguments on both the Motion for Summary Judgment and on the claims that had not been fully addressed in the hearing on Servpro's Motion to Dismiss.

The trial court ruled in favor of Servpro on all claims. The court reiterated its earlier ruling on Servpro's obligations under its territorial policy, and dismissed Mr. Pizzillo's counterclaims for lack of adequate training and for usury. The court also found that Mr. Pizzillo had violated the non-compete provision in the franchise agreement, and enjoined him from any further violations for the two year period set out in the agreement. The court awarded the appellee a judgment of $7,758.22 against the appellant for money owed, as well as attorney fees and expenses incurred in collecting on the note. This appeal followed.

## III.
### THE TERRITORIAL POLICY

Mr. Pizzillo contends on appeal that the trial court erred in granting Servpro's Motion to Dismiss his counterclaims for breach of the territorial policy in the franchise agreement, and for breach of the implied covenant of good faith and fair dealing. He argues that the court was in error because he stated claims upon which relief could be granted. The appellee argues that these claims were addressed by the trial court in the substantive context of the appellee's Motion for Summary Judgment.

The record establishes that the trial court conducted a hearing to determine the issues raised in both motions. At the hearing, the trial judge stated that he was "just going to have to separate [the two motions] in [his] mind." However, it is unclear from the record if he was able to do so. At the hearing, references were made to the franchise agreement itself, as well as to the appellant's deposition testimony that he relied on alleged representations of the appellee in entering into the agreement. We are unable to determine from the record whether or not the trial court considered

extrinsic evidence in ruling on this issue. However, for the purposes of the present appeal, this Court will consider both the franchise agreement and the deposition testimony in the record. Accordingly, we will treat this issue in the context of summary judgment and make disposition as provided by Rule 56 of the Tennessee Rules of Civil Procedure. *See Hensley v. Fowler*, 920 S.W.2d 649, 650 (Tenn. Ct. App. 1995).

It is undisputed that by its own terms, the territorial policy gives Servpro the power, but not the obligation, to take steps against franchisees who encroach upon the territory of other franchisees. Mr. Pizzillo contends, however, that the franchisor's discretion is not unfettered, and that Servpro violated its duty of good faith and fair dealing by not punishing the operator of the offending franchise for soliciting business and performing work in Mr. Pizzillo's territory.

A duty of good faith and fair dealing is implied under Tennessee law in the performance of every contract. *TSC Industries, Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App.1987). Thus, a contracting party cannot totally immunize itself against breach of contract claims by simply adding a clause to a contract making any of its provisions discretionary. *See Park Place Center Enterprises, Inc., v. Park Place Mall*, 836 S.W.2d 113 (Tenn. Ct. App. 1992).

In interpreting a contract, a court must review every part, "for one clause may modify, limit, or illuminate another." *Cocke County Board v. Newport Utilities Board*, 690 S.W.2d 231, 237 (Tenn. 1985). The contract in the present case gives Servpro the power to discipline franchisees who have violated the territorial policy, but does not contain a promise by the franchisor that it will police relationships between its franchisees. Neither the clause giving Servpro the power to discipline its franchisees, nor the one giving it discretion as to whether or how it does so, may be treated as mere surplusage.

To prevail on a claim that a party's exercise of its contractual discretion actually constitutes a breach of the covenant of good faith and fair dealing, the opposing party must prove the breach. To avoid summary judgment on such a claim, the claimant must present at least some evidence to support his theory.

While Mr. Pizzillo has alleged that the activities of Mr. Tzucanow have drawn customers away from his franchise, resulting in a loss of revenue and profits, we do not believe he has alleged any facts to indicate any kind of bad faith on Servpro's part. There is, for example, no evidence that the agents of the franchisor bore any kind of malice against Mr. Pizzillo, that they wished to damage or destroy his franchise, or that they colluded with Greg Tzucanow to expand the franchise of Servpro of Oakland Park at the expense of Servpro of Fort Lauderdale. We thus believe that the trial court did not err in dismissing Mr. Pizzillo's counterclaim.

Lest it should be inferred that this court has left Mr. Pizzillo with no remedy at all, we note that our decision has not impaired his possible remedies against the offending franchisees, including claims in tort, or as a third party beneficiary of the contract between Servpro and Mr. Tzucanow. In fact, the record indicates that Mr. Pizzillo has filed a suit in Florida State Circuit Court, based on

the same facts as the present suit, and naming Greg Tzucanow, Servpro of Oakland Park, Inc., and Larry Coken as defendants.

## IV.
### THE USURY CLAIM

The appellant raised the defense of usury to defeat Servpro's claim on the note. The trial court found the defense of usury to be inapplicable to the facts of this case, observing that under Tennessee law, the difference between the amount charged on the sale of property for cash, and the amount charged for deferred payment or for payment in future installments is considered a "time-price differential," and is not subject to the usury statutes. Tenn. Code Ann. §§ 47-14-102(10) and 47-14-120.

Mr. Pizzillo has raised the usury argument again on appeal. His argument is based simply on the fact that the face of the note he signed does not say anything about a time-price differential, but does state an interest rate of 13.5%, which is well in excess of the permissible 10% rate under the usury statute, Tenn. Code Ann. § 47-14-121. The appellant cites three cases in support of the proposition that if usury is apparent from the face of the note, then the transaction is subject to the usury laws. *Brabson v. Valentine*, 804 S.W.2d 451 (Tenn. Ct. App. 1990), *White v. Kaminsky*, 264 S.W.2d 813 (Tenn. 1954), and *Deaton v. Vise*, 210 S.W. 2d 665 (Tenn. 1948).

It appears to us, however, that the transactions in those cases can easily be distinguished from the one in dispute. We note that in the three cited cases, a loan of money was made, and a note was given in exchange. In the present case, Mr. Pizzillo did not borrow money from Servpro, but purchased both tangible and intangible property (the franchise and the equipment) and gave the franchisor his note in exchange for the property. This meets the definition of a time-price differential as found in Tenn. Code. Ann. § 47-14-102(10).

> "Time-price differential" is the difference, however denominated or expressed, between the amount charged on a sale of property, or a charge for services, for cash and the amount charged if payment were to be deferred or if payment were to be made in future installments; provided, that any difference in such amounts charged with respect to the sale of real property to be owned and occupied by the purchaser as the purchaser's principal place of residence for family residential purposes shall be considered to be interest rather than time-price differential."

As the trial court noted, Tenn. Code Ann. § 47-14-120 specifically exempts transactions involving time-price differentials from the regulation of interest rates found in the usury statutes.

The appellant cites the case of *Pacific Eastern Corporation v. Gulf Life Holding Company,* 902 S.W.2d 946 (Tenn. Ct. App. 1995) for the proposition that the courts look to the substance, not the form, of the transaction under scrutiny, and will treat a transaction as a loan, if that is in fact what

it is. Examining the substance of the franchise agreement, however, it appears to us that the appellant's note represents consideration for a bonafide purchase rather than for a loan. Thus, *Pacific Eastern* undermines the appellant's argument rather than supporting it. The trial court did not err in dismissing the Mr. Pizzillo's usury claim.

## V.
### THE COVENANT NOT TO COMPETE

It is frequently stated that covenants not to compete are disfavored by the law, because they are considered to be in restraint of trade. *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471 (Tenn. 1984). Such covenants are not invalid per se, however, and they may be enforced if they are deemed to be reasonable under the circumstances. *Central Adjustment Bureau v. Ingram*, 678 S.W.2d 28 (Tenn. 1984); *Allright Auto Parks v. Berry*, 409 S.W.2d 361 (Tenn. 1966).

The question of what is reasonable usually involves the duration and geographic scope of the covenant, as well as other factors which balance one party's right to earn a living and to practice his trade against the other's right to be free from unfair competition. *Dabora, Inc. v. Kline*, 884 S.W.2d 475 (Tenn. Ct. App. 1994); *Selox, Inc. v. Ford*, 675 S.W.2d 474 (Tenn. 1984). The agreement in the present case prohibited Mr. Pizzillo from competing with the franchisor within the former operating territory of Servpro of Fort Lauderdale as well as within a 25 mile radius extending from that territory, for a period of two years from the termination of his franchise.

The appellee points out that Tennessee courts have found agreements with even broader restrictions to be valid. For example, in *Greene County Tire & Supply, Inc. v. Spurlin*, 338 S.W.2d 597 (Tenn. 1960), the Supreme Court upheld a covenant not to compete that was signed in conjunction with the sale of a tire recapping business. The sellers agreed not to compete with the purchaser for a period of five years, within a 100 mile radius of Greeneville, where the selling corporation's business had been located. Even though tire recapping was a very commonplace type of business that could be found in almost every county in Tennessee, and was the only trade that the defendant was equipped to perform, the court found that in light of the consideration received the covenant was reasonable, and therefore enforceable.

In *Ramsey v. Mutual Supply*, 427 S.W.2d 849 (Tenn. Ct. App. 1968), this court upheld a five-year covenant which prohibited a salesman from competing in any of the territory in which his former employer did business. This territory included most or all of Tennessee and Kentucky, as well as parts of Mississippi and Alabama. The covenant encompassed all of the territory the plaintiff had previously serviced, as well as areas with which he had no previous business contact.

The appellant contends that the court must look beyond the territorial and temporal restrictions in the covenant in order to determine its reasonableness. He cites the case of *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471 (Tenn. 1984), in which our Supreme Court found that a non-compete clause in a truck driver's employment contract was unenforceable, because it did not present any special facts to justify the burden it imposed on the plaintiff's right to earn a living.

The Court held that an employer cannot use the device of a non-compete clause in an employment contract to restrain ordinary competition, and that in order for an employer to be entitled to protection, "there must be special facts present over and above ordinary competition. These special facts must be such that without the covenant not to compete, the employee would gain an unfair advantage in future competition with the employer."

The Court went on to discuss some specific interests that an employer might need to protect, and which would entitle it to enforce an agreement not to compete:

> "Such legitimate business interests include trade or business secrets or other confidential information. Restrictive covenants have been held reasonable where the employee closely associates or has repeated contact with the employer's customers so that the customer tends to associate the employer's business with the employee. Covenants have also been held reasonable in order to prevent misuse of customer lists."

671 S.W.2d at 473.

Since the present case involves a relationship between a franchisor and a former franchisee, rather than between an employer and former employee, we must consider Servpro's interest in protecting the value of the basic product it has to sell: its franchises. *See Shakey's Inc. v. Martin*, 430 P.2d 504 (Idaho 1967); *Sub Station II, Inc. v. Joseph Banasiak, et al.*, No. 83-266-II (Tenn. Ct. App. at Nashville, filed June 15, 1984).

It is apparent that Servpro would have a more difficult time finding a new franchisee for the Fort Lauderdale territory if a former franchisee were performing the same services within that territory, while soliciting the same customers he previously serviced as a Servpro franchisee. The evidence suggests that the term "customers" should in this case refer not only to individual property owners for whom Servpro franchisees do restoration work, but also property managers, insurance agents and adjustors who are a major source of referrals for the restoration business. This is relevant because it goes to the appellant's argument that there is no proof in the record that ARN solicited any customers that had been serviced by Servpro of Fort Lauderdale.

The proof shows that Mr. Pizzillo began working for ARN, his wife's company, shortly after the termination of his franchise agreement. Her deposition testimony indicates that ARN solicits within the boundaries of Servpro of Fort Lauderdale's former operating territory, and that her company has solicited business from some of the same insurance agencies and property managers that Servpro of Fort Lauderdale solicited. Indeed, she named three property managers that both companies did work for.

In his own deposition testimony, Mr. Pizzillo attempted to distance himself from the restoration side of ARN's business by claiming that he is primarily engaged in general contracting.

He reluctantly admitted, however, that he has been involved in some water and fire damage restoration projects while working for ARN.

The evidence also shows some striking similarities between the operations of Servpro of Fort Lauderdale and those of ARN. For example, ARN operates, at least in part, out of the same address and warehouse/office that Servpro of Fort Lauderdale used. Also, Ms. Harry was involved in sales and marketing for Servpro of Fort Lauderdale for three years; as president of ARN, she is also in charge of sales and marketing. Mr. Pizzillo's mother answered the phones for Servpro of Fort Lauderdale and continues to do so for ARN. At least two other employees of Servpro of Fort Lauderdale now do restoration work for ARN. Mr. Pizzillo and Ms. Harry both admitted that ARN has borrowed equipment that was the property of Servpro of Fort Lauderdale, for use on restoration projects.

The franchise agreement provided that at its termination, the franchisee's business phone was to be turned over to Servpro. Mr. Pizzillo claimed that he was willing at all times to do so, but that Servpro took no steps to take possession of the phone number. He admitted, however, that he paid $200 per month through November of 1999 to maintain the phone. Callers to that number heard a recorded message that said they had reached the emergency line for 568-9494, and asked them to leave their name and number. Although Mr. Pizzillo denied that ARN gained any economic benefit by maintaining the phone number, it can be fairly inferred that callers seeking to reach Servpro of Fort Lauderdale for restoration work were ultimately referred to ARN for that same work.

It is apparent that upon the termination of his franchise, Mr. Pizzillo continued to work in substantially the same business, but under a different name, and ostensibly under different ownership. Although he ceased using the Servpro name, his wife solicited and obtained business from some of the same customers that she dealt with as an unpaid employee of Servpro of Fort Lauderdale. Mr. Pizzillo attempted to distance himself from Servpro's core business of restoration by focusing on general contracting, but he could not, or would not, totally avoid restoration work. In any case, the franchise agreement prohibits him from working for any business which competes with Servpro, in any capacity whatsoever.

While we have no wish to unduly restrict Mr. Pizzillo in the exercise of his trade, we believe Servpro should be able to protect the value of its franchises by preventing its former franchisees from competing against it for a reasonable time and within a limited geographic area. By signing the franchise agreement, Mr. Pizzillo agreed to be bound by the non-compete covenant, and we believe the trial court was correct in finding it enforceable against him.

## VI.
### THE "FIRST BREACH" ARGUMENT

As an affirmative defense to all of Servpro's breach of contract claims, Mr. Pizzillo argued that Servpro committed the first breach when, as early as 1994, it failed to enforce the territorial agreement. Servpro, for its part, argued that Mr. Pizzillo waived his first breach defense by

continuing to perform under the contract. The appellee contends that in the face of the purported breach, the appellant had the right of electing whether to terminate the contract, or to continue to perform, and to sue the appellee for the breach. The appellee notes that the appellant chose not to terminate the contract at that time, but continued to use the Servpro name, trademarks and methods in his operation.

It appears to us, however, that the judgment for Servpro on Mr. Pizzillo's counterclaims amounts to a conclusive finding that Servpro did not breach its contract with him. Thus, the first breach argument is moot.

## VII.

The judgment of the trial court is affirmed. Remand this cause to the Circuit Court of Sumner County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant, Stephen Pizzillo.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.